**PROVIDENT AMERICAN INSURANCE COMPANY, Petitioner,**

v.

**Denise CASTAÑEDA, Respondent.**

No. 96–0249.

Supreme Court of Texas.

Argued on Jan. 8, 1998.

Decided Dec. 31, 1998.

Rehearing Overruled April 29, 1999.

render judgment that Castañeda take nothing.

## I

Denise Castañeda's father, Guillermo Castañeda, Sr., applied for medical insurance with Provident American Insurance Company in May 1991. He sought a policy that would cover the entire family including his daughter Denise, who was twenty-one years old at the time, her sister, and their brother Guillermo, Jr. During the application process, Guillermo Castañeda, Sr. failed to disclose that just two days before he applied for the policy, Guillermo, Jr. had received medical attention from a physician for jaundice, anemia, and suspected hepatitis. Denise had received medical treatment for jaundice and hepatitis several years prior to the date her father applied for health insurance.

Provident American issued a policy to the family effective June 17, 1991. The policy contained two limitations that are relevant here: (1) it did not cover expenses resulting from a sickness that "manifests" within thirty days of the policy's effective date; and (2) it excluded diseases or disorders of certain internal organs, including the gallbladder, unless the loss occurred more than six months after the policy's effective date.

Scott P. Stolley, Dallas, Julie Caruthers Parsley, Austin, Colbert N. Coldwell, El Paso, for Petitioner.

Timothy Patton, San Antonio, Ben Langford, El Paso, for Respondent.

Justice OWEN delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice BAKER, and Justice ABBOTT joined, and in which Justice ENOCH joined in all but part V.

Denise Castañeda seeks damages from Provident American Insurance Company for alleged violations of the Insurance Code and the Deceptive Trade Practices Act arising out of the denial of her claim for benefits under a health insurance policy and the manner in which her claim was handled. Because the evidence is legally insufficient to support the jury's verdict, we reverse and

Less than thirty days after the issuance of the policy, the family learned that Denise's uncle had been diagnosed with hemolytic spherocytosis (HS), a hereditary condition that causes misshapen blood cells. The spleen destroys these cells, which causes the sufferer to exhibit anemia, jaundice, and, in 90% of the cases, gallstones. The treatment for this condition is to remove the spleen and, if gallstones are present, the gallbladder. Because the disease is hereditary, it was suggested that the Castañedas be tested for HS. Denise and Guillermo, Jr. had exhibited yellow skin all of their lives, and on July 20, 1991, the third day after the thirty-day period expired, they were taken to a physician who diagnosed them that same day with HS and referred them to a blood specialist. They saw the hematologist two days later, and he concurred in the HS diagnosis. Two weeks later, Denise and Guillermo, Jr. each

had their spleen and gallbladder surgically removed.

The Castañedas submitted claims to Provident American, which were denied. Provident American first asserted the six-month policy exclusion for disorders of the gallbladder but later denied the claims on the basis that HS had manifested within thirty days of the policy's effective date.

Denise Castañeda sued Provident American, alleging violations of the DTPA and of article 21.21 of the Texas Insurance Code, and Guillermo Castañeda, Sr. sued on behalf of Guillermo, Jr. The two suits were consolidated, but Guillermo Castañeda, Sr. later nonsuited his claims. Denise Castañeda proceeded to trial, and the district court submitted three liability questions based on article 21.21 of the Insurance Code and on the DTPA.[1] The jury answered "yes" to each and found that Provident American had engaged in knowing conduct. The jury awarded $50,000 for Denise Castañeda's loss of credit reputation and loss of benefits, collectively, but found no mental anguish damages. The jury also awarded reasonable attorney's fees of 33% of Castañeda's recovery. The trial court rendered judgment on the verdict, trebling the damages and adding a twelve percent penalty on the lost benefits.

The court of appeals affirmed, except as to the twelve percent penalty.[2] Regarding other points of error, the court of appeals concluded that the trial court had erroneously submitted at least one subpart of the first liability question (subpart A)[3] but held that this error was harmless because two other subparts (J and H) were properly submitted and supported by legally and factually sufficient evidence.[4] The court of appeals also held that the evidence was sufficient to support the award of $50,000 for loss of credit reputation and loss of benefits.[5] Provident American filed an application for writ of er-

ror with this Court, which we granted. Because there is no evidence to support a finding of liability based on any of the theories submitted to the jury, we do not reach the question of whether a trial court's judgment may be affirmed if a liability question includes a theory that is not legally cognizable but other viable theories are included within the same question. Likewise, we do not reach Provident American's complaint that attorney's fees were improperly based on a percentage of the recovery, an issue that we addressed in *Arthur Andersen & Co. v. Perry Equipment Corp.*[6] after the court of appeals' decision became final in this case.

## II

We begin our review with the first question submitted to the jury.[7] The numerous subparts of Question 1 can be distilled into three categories: (1) whether Provident American denied the claim without a reasonable basis or after its liability had become reasonably clear, (2) whether there was a misrepresentation about the policy, and (3) whether Provident American engaged in unfair claims settlement practices. We first consider whether there was any evidence to support a finding that Provident American denied Castañeda's claim without a reasonable basis or after its liability had become reasonably clear.

## III

The trial court submitted two instructions to the jury regarding Provident American's denial of the claim. Subpart J of Question 1 was based on article 21.21–2, section 2(b)(4)[8] and defined an unfair or deceptive act or practice as including: "[n]ot attempting in good faith to effectuate a prompt, fair, and equitable settlement of a claim when

---

1. The liability issues submitted to the jury are included in Appendix A.

2. 914 S.W.2d 273, 284.

3. *Id.* at 277.

4. *Id.* at 280.

5. *Id.* at 281–82.

6. 945 S.W.2d 812, 818–19 (Tex.1997) (holding that a plaintiff must ask the jury to award attorney's fees in a specific dollar amount in a DTPA case).

7. *See* Appendix A, Question 1.

8. Tex Ins.Code art. 21.21–2, § 2(b)(4).

liability has become reasonably clear."[9] Subpart G of Question 1 was a hybrid theory that defined an unfair or deceptive act or practice as including: "[d]enying a claim or delaying payment on a claim without a reasonable basis or failing to determine whether there is any reasonable basis for the denial or delay."[10] This instruction embodied the pre-*Giles*[11] common-law definition of bad faith, but the jury issue included producing cause,[12] which is the causation element for an article 21.21 claim.[13] However, the parties agree that only statutory claims were tried and that no common-law bad faith claim was submitted. Provident American did not urge the trial court to exclude subpart G from the definitions of an "[u]nfair or deceptive act or practice"[14] and contends only that there is no evidence to support a jury finding based on this definition. Our no-evidence review of subpart G is governed by our pre-*Giles* decisions because this instruction was couched in the same terms as the pre-*Giles* definition of common-law bad faith. Thus, our decisions in *Lyons v. Millers Casualty Insurance Co.*[15] and *National Union Fire Insurance Co. v. Dominguez*[16] guide us in reviewing the record to see if there is any evidence that would support a jury finding based on subpart G.

To determine whether there is any evidence to support a jury finding under Subpart G or J, we must first identify the po-

tential bases Provident American had for denying Castañeda's claim.[17] Then we must determine whether there is any evidence that no reasonable insurer could have denied payment of her claim and whether there is any evidence that liability had become reasonably clear.[18]

## A

■ At varying times, Provident American gave varying reasons for denying Denise Castañeda's claim, but all were grounded in a common nucleus of facts. Provident American cited a policy provision that excluded coverage for a sickness or disorder involving the gallbladder unless the loss occurred more than six months after the date the policy went into effect.[19] Provident American also relied on policy provisions that limited coverage to an illness or disease that first manifested more than thirty days after the policy went into effect.[20] At least one Provident American employee thought that the claim also could have been denied based on the pre-existing condition provision of the policy, although that clause was never invoked. We conclude that, considering all the facts in existence at the time of the denial, there is no evidence that there was no reasonable basis for Provident American's denial of Cas-

9. *See* Appendix A, Question 1, subpart J.

10. *See* Appendix A, Question 1, subpart G.

11. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48 (Tex.1997).

12. *See* Appendix A, Question 1.

13. A breach of the common-law duty of good faith and fair dealing inherent in the dealings between an insurer and its insured must be the proximate, rather than producing, cause of damage. *See Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 215 (Tex.1988); *see also Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995) (discussing the difference between proximate and producing cause).

14. *See* Appendix A, Question 1.

15. 866 S.W.2d 597 (Tex.1993).

16. 873 S.W.2d 373 (Tex.1994).

17. *Id.* at 376.

18. *Id.; see also* TEX. INS.CODE art. 21.21–2, § 2(b)(4).

19. The policy provided: "Coverage is not provided for sickness or disorder involving the following unless loss incurred six months after the Policy Date: hernia, varicose veins, hemorrhoids, reproductive organs, appendix, tonsils, adenoids or gallbladder."

20. The insuring clause, which is the first paragraph of the policy, stated that it provided benefits only for accidental bodily injury and "sickness, which first manifests itself more than thirty (30) days after the effective date of this Policy, hereinafter referred to as such sickness." In the definitions section, the policy defined "[s]ickness" as an "illness or disease of a member of the Family Group which first manifests itself more than 30 days after the Policy date and while the policy is in force." Other provisions stated that coverage extended to services and supplies "necessary for the treatment of the injury or sickness."

tañeda's claim (subpart G) or that liability had become reasonably clear (subpart J).

■ We first consider denial based on manifestation of HS prior to the end of the thirty-day period. The parties dispute when Castañeda's illness manifested. Castañeda argues that there is some evidence that her hereditary illness first manifested after the thirty-day period, and Provident American contends that it manifested before the end of the thirty-day period. However, even if Castañeda were correct, evidence of coverage, standing alone, would not constitute evidence of bad faith denial. In *State Farm Lloyds v. Nicolau,*[21] we reconfirmed what we held in *Transportation Insurance Co. v. Moriel,*[22] *National Union Fire Insurance Co. v. Dominguez,*[23] and other cases, which is that evidence showing only a bona fide coverage dispute does not demonstrate that there was no reasonable basis for denying a claim. By the same token, evidence of a coverage dispute is not evidence that liability under the policy had become reasonably clear.

We held in *Dominguez* that one physician's opinion that the plaintiff's condition was work-related did not raise a fact issue of whether there was no reasonable basis for denial of a claim because the insurer was entitled to rely on the opinion of other medical professionals who had diagnosed the condition as a degenerative disease.[24] Likewise, in *Lyons,* we held that the jury was entitled to resolve a conflict in the evidence about whether a windstorm had damaged a home but that evidence related to contractual coverage was not evidence of bad faith unless there was also evidence that the information on which the insurance company relied in denying the claim was unreliable or not objectively prepared.[25] Thus, when medical evidence is conflicting, liability is not reasonably clear, and it cannot be said that the insurer had no reasonable basis for denying the claim unless the medical evidence on which the insurer based its denial is unreliable and the insurer knew or should have known that to be the case.[26]

In *Nicolau,* this Court concluded that there was evidence of no reasonable basis to deny the claim because the carrier had either relied on an expert's report that the carrier knew "was not objectively prepared" or because "the insurer's reliance on the report was unreasonable."[27] By contrast, there is no evidence in this case that any of the information on which Provident American ultimately relied in denying coverage was "not objectively prepared" or that reliance on the information was unreasonable. The medical records revealed that just three days after the thirty-day waiting period expired, Denise Castañeda saw a physician and was diagnosed with a hereditary blood disorder. Two weeks later, she underwent surgery to remove her spleen as treatment for this condition. During surgery it was confirmed that her disorder had caused gallstones, and her gallbladder was also removed.

The undisputed evidence showed that Denise Castañeda and her brother had exhibited symptoms even before their father applied for the policy. Castañeda's father wrote to Provident American, providing facts that supported a conclusion that the disease had manifested before the end of the thirty-day period and that there was no coverage. Guillermo Castañeda, Sr. advised the following:

21. 951 S.W.2d 444, 448 (Tex.1997).

22. 879 S.W.2d 10, 17 (Tex.1994).

23. 873 S.W.2d at 376–77.

24. *Id.* at 377.

25. *See Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 600–01 (Tex.1993).

26. *See also Connolly v. Service Lloyds Ins. Co.,* 910 S.W.2d 557, 563 (Tex.App.—Beaumont 1995, no writ) (holding that the carrier established its good faith as a matter of law when

summary judgment evidence demonstrated a bona fide controversy regarding the need for back surgery and the carrier relied on a report that surgery was not necessary)(citing *Packer v. Travelers Indem. Co.,* 881 S.W.2d 172, 176 (Tex. App.—Houston [1st Dist.] 1994, no writ)); *Ramirez v. Transcontinental Ins. Co.,* 881 S.W.2d 818, 826 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (holding that an insurer had conclusively established a reasonable basis for denying a claim when it relied on an expert's opinion, even though another expert had expressed a conflicting opinion).

27. *State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex.1997).

- Days before he applied with Provident American for a policy, his son's school nurse noted that his son was "drastically jaundice [sic] and lethargic;" she recommended that Guillermo Castañeda take his son to a physician, and he did.
- During the thirty-day waiting period, the Castañedas received a call from Denise's uncle who informed them he had been diagnosed with "Congenital Spherocytosis and a Splenectomy was performed."
- "The physicians warned that every member of my wife's family with jaundice symptoms must be examined."
- "So as Denise and [her brother] had their skin a little yellow throughout their whole lifes [sic], both were checked and diagnosed ... July 20, 1991 [three days after the end of the thirty-day waiting period]."

There is no evidence calling into question Provident American's reliance on this information or its reliance on medical records and on communications with Denise Castañeda's physicians.

The dissent argues that Provident American's failure to consult a physician before it denied the claim is some evidence to support the jury's verdict. In the same vein, the dissent points to the testimony of an expert witness for Provident American who said that HS is a rare condition requiring special expertise for diagnosis. But the issue is not whether a layperson could diagnose HS. It is undisputed that Denise Castañeda had HS and that HS was the reason for her surgery. The issue is whether there was no reasonable basis for an insurer to conclude that HS had first manifested before the end of the thirty-day period in light of the medical records and other information reasonably available to the carrier at the time it denied the claim. There is no evidence that a reasonable insurer could not have relied on information which indicated that HS had manifested before the end of the thirty-day period.

The dissent implies that a factfinder could reasonably infer from the testimony of Provident American's expert regarding claims-handling practices of insurance companies that Provident American did not have enough information to deny the claim when it did. The record does not comport with the dissent's characterization of the evidence. While the expert did say that a company should not deny a claim if it does not have enough information, he did not testify that Provident American lacked adequate information to deny the claim. The expert testified directly to the contrary.

The dissent also asserts that a Provident American employee, Laurie Haggard, testified that she did not have enough information to deny the claim when she sent a December 1991 letter, which quoted the thirty-day policy provision and said that Provident American would re-open the claim upon receipt of new information.[28] The dissent takes this testimony entirely out of context. It is clear from Haggard's testimony that when she prepared and sent the December 1991 letter, she had concluded that Denise Castañeda's claim was not payable but that reconsideration would be forthcoming if information was provided by the insured that HS had first manifested after the thirty-day period. Haggard's testimony and unchallenged documentary evidence also confirm that additional information was provided after December 1991 and that this additional information did not support the conclusion that HS first manifested within the three-day window. By no stretch of the imagination can one infer from Haggard's testimony that Provident American did not have adequate information to deny the claim.

In order for subpart G to support a verdict, Castañeda was required to come forward with some evidence that no reasonable insurer could have believed that HS had manifested before the end of the thirty-day period (an objective prong of the "no reasonable basis" definition of bad faith)[29] and that Provident American knew or should have known that it had no reasonable basis for denying the claim based on the thirty-day waiting period (the second prong).[30] In order for subpart J to support a verdict, Cas-

---

**28.** 988 S.W.2d at 204.

**29.** *See Dominguez*, 873 S.W.2d at 376.

**30.** *Id.*

tañeda was required to come forward with some evidence that liability was reasonably clear. She did not meet her burden.

The jury's failure to find that HS first manifested prior to July 17, 1991 is not dispositive of the issue of liability under the DTPA or the Insurance Code, which are extra-contractual claims. Provident American requested a defensive issue in an effort to establish that there was no coverage under the contract of insurance.[31] But even if the jury's negative answer to this issue amounted to a finding of contractual coverage, coverage is not the equivalent of and cannot be the only evidence of bad faith. In *Lyons*, the jury found that the insured's loss was covered by the policy, but we explained that "bad faith focuses not on whether the claim was valid, but on the reasonableness of the insurer's conduct in rejecting the claim."[32] There is no evidence that Provident American had no reasonable basis for concluding that HS had first manifested in Denise Castañeda prior to the end of the thirty-day period.

Provident American was not required to appeal the jury's failure to find that HS had manifested before the end of the thirty-day period because Castañeda never sought and did not receive any contractual relief. The only theories of liability at issue in the trial court were extra-contractual ones.

We express no opinion regarding the dissent's extended discussion of whether there was contractual coverage and the meaning of "manifest" as used in Castañeda's policy. We note only that there is considerable authority that "manifest" does not necessarily mean manifest to the insured.[33]

**B**

■ Castañeda contends that Provident American is liable on an independent ground because one of the reasons it gave for denying coverage was the policy's exclusion of gallbladder disorders during the first six months that the policy was in effect. After Provident American initially had denied coverage on that basis, one of Castañeda's physicians advised that the gallbladder surgery was secondary to HS. At least some individuals within Provident American's organization thereafter concluded that the gallbladder exclusion did not apply. The claim was then denied based on the thirty-day provision discussed above, and the thirty-day provision

---

**31.** The jury was asked:

> Do you find from a preponderance of the evidence the HEMOLYTIC SPHEROCYTOSIS of Plaintiff, DENISE CASTAÑEDA, first manifested itself prior to July 17, 1991?
>
> You are instructed that under the policy a covered "sickness" is an illness or a disease of a member of the family group which first manifests itself more than thirty (30) days after the policy date.
>
> You are further instructed that "Manifestation" does not necessarily mean the time at which a covered sickness is medically diagnosed.
>
> Answer: "Yes" or "No"
> Answer: *no*

**32.** *See Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597, 601 (Tex.1993).

**33.** *See, e.g., Dirgo v. Associated Hosps. Serv., Inc.*, 210 N.W.2d 647, 650 (Iowa 1973) (holding that condition is manifest when it would be manifest to a person learned in medicine from symptoms or other physical conditions that the illness or disease exists); *Bishop v. Capitol Life Ins. Co.*, 218 Kan. 590, 545 P.2d 1125, 1129 (Kan.1976) (holding that symptoms of heart disease were active or manifest because they were manifest to

one learned in medicine prior to the effective date of the policy); *Southards v. Central Plains Ins. Co.*, 201 Kan. 499, 441 P.2d 808, 811, 813–14 (Kan.1968) (equating origination of disease with manifestation and holding that insured's Bright's disease was active and manifest because it was manifest to those learned in medicine before the policy became effective, although insured had no knowledge that he had the disease); *Dowdall v. Commercial Travelers Mut. Accident Assoc.*, 344 Mass. 71, 181 N.E.2d 594, 596 (Mass. 1962) (holding that symptoms of disease were manifest long before issuance of the policy when symptoms first appeared years earlier and physician had reasonable cause to believe the plaintiff had multiple sclerosis even though definitive diagnosis was not made until later); *Rosenberg v. North Dakota Hosp. Serv. Assoc.*, 136 N.W.2d 128, 132 (N.D.1965) (holding that "originates" includes "manifest" and indicating that disease would have been manifest if physicians could have diagnosed it); *Richards v. American Sec. Life Ins. Co.*, 303 P.2d 1110, 1112 (Okla.1956) (equating "originates" with manifests and holding that a cataract may manifest by a distinct symptom or condition from which one learned in medicine could with reasonable accuracy diagnose the specific ailment that thereafter caused the hospital confinement); *see generally* RHODES, COUCH ON INSURANCE, § 41A:41 (2d rev. ed.1982).

was cited as the reason for denial when Provident American subsequently responded to an inquiry from the Department of Insurance. However, many months after the claim had been denied because of the thirty-day provision, one of Denise Castañeda's physicians called Provident American to inquire once again why the claim had not been paid and was told that it was because of the six-month exclusion regarding the gallbladder. The president of Provident American also maintained at trial that the claim was not payable because of the gallbladder exclusion and the thirty-day provision.

■ We assume, but need not decide for purposes of our analysis, that the removal of Castañeda's gallbladder did not fall within policy exclusions. We thus assume that the gallbladder exclusion was not a valid basis for denying coverage. But not every erroneous denial of a claim subjects an insurer to liability, as we confirmed once again in *Republic Insurance Co. v. Stoker*.[34] There is no evidence in this record that no reasonable insurance company would have denied coverage in light of other facts.

One of Provident American's employees did testify that it was "improper" to deny the claim based on the gallbladder exclusion, and all but the president of the company agreed that reliance on the gallbladder exclusion was misplaced. This testimony is evidence that Provident American denied the claim for the wrong reason, but it does not amount to evidence that no insurer could reasonably have denied the claim. We addressed an analogous situation in *Lyons*[35] when we distinguished *Aranda v. Insurance Co. of North America*.[36] We pointed out in *Lyons* that the insured in *Aranda* alleged not only that there was evidence of coverage but also that the carrier's adjusters determined that Aranda's claim was compensable and advised the carriers to pay the claim.[37] There is no evidence that anyone at Provident American thought that Castañeda's claim was covered and should be paid. Every Provident American employee, including the employee who concluded that reliance on the gallbladder exclusion was improper, testified that the claim nevertheless was not payable because of the thirty-day provision in the policy. The dissent's statement that Provident American's own witnesses testified that the claim was denied without a reasonable basis has no support in the record.

As just discussed above, there was no evidence that no reasonable carrier could have concluded that HS first manifested prior to the end of the thirty-day waiting period. We explained in *Stoker* that in determining if an insurer had no reasonable basis to deny coverage, the facts existing at the time of denial are dispositive.[38] We said, "[t]he Stokers cannot preclude Republic from relying on a reason for denying their claim that existed at the time, even if it was not the reason Republic gave."[39] From the time Provident American first denied the claim based on the gallbladder exclusion through the trial of this case, there were facts that gave rise to another coverage question—the thirty-day waiting period. There is no evidence that, in view of the thirty-day provision, Provident American's liability under the policy was reasonably clear when it denied coverage or that it had no reasonable basis for denying coverage.

■ Castañeda and the dissent contend that because Provident American gave different reasons for denying the claim at different times, there is some evidence that the denial was pretextual, citing *Nicolau*[40] and *Sim-*

---

34. 903 S.W.2d 338, 340 (Tex.1995) (stating that as long as the insurer has a reasonable basis to deny or delay payment of the claim, even if that basis is erroneous, the insurer is not liable for bad faith) (citing *Lyons*, 866 S.W.2d at 600); *see also Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex.1988) (stating that carriers "will not be subject to liability for an erroneous denial of a claim" unless there was no reasonable basis for denial).

35. 866 S.W.2d at 601.

36. 748 S.W.2d at 213.

37. *See Lyons*, 866 S.W.2d at 601; *see also Aranda*, 748 S.W.2d at 213–14.

38. *See Stoker*, 903 S.W.2d at 340.

39. *Id.* at 341.

40. *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444 (Tex.1997).

*mons.*[41] In *Nicolau,* the Court concluded that there was some evidence that the carrier knew that the expert report on which it relied was of questionable validity.[42] In *Simmons,* the Court concluded that there was evidence that the investigation was biased and outcome-oriented because there was evidence that the carrier knowingly and repeatedly ignored evidence that the insureds did not burn down their home and that they had no motive for arson.[43] Our use of the term "pretextual" in *Nicolau* and *Simmons* did not mean that an insured is relieved from its burden of offering evidence that liability had become reasonably clear or that there was no reasonable basis for denying the claim. We did not redefine the common-law tort of bad faith or the legal sufficiency standard of review for article 21.21 cases to include a mechanism by which a factfinder could conclude that the denial was pretextual even though there was a reasonable basis for denying the claim. The use of the concept "pretextual" was another way of saying that there must be some evidence that there was no reasonable basis for denying the claim or that liability was reasonably clear. Here, there is no evidence that Provident American ignored information that would lead a reasonable person to conclude that liability under the policy was reasonably clear or that there was no reasonable basis to deny the claim.

## IV

Other instructions submitted to the jury within Question 1 (subparts H, I, and K) concern Provident American's settlement practices.[44] Subpart K is based on subsection 2(b)(5) of article 21.21–2[45] and asked whether Provident American had compelled Castañeda to institute suit to recover amounts due under the policy by offering substantially less than was ultimately recovered. Subsection 2(b)(5) provides a remedy

when an insurer neither unreasonably denies nor delays making a settlement offer but nonetheless makes an offer that is so clearly deficient that it is functionally a denial of the claim. There is no evidence that Provident American offered any settlement, and thus any jury finding based on this subpart would have had no support in the record.

■ Castañeda contends that she is entitled to recover damages equivalent to policy benefits if Provident American failed to acknowledge communications about the claim (subpart H) or if it failed to adopt reasonable standards for investigating claims (subpart I). Neither the statutes nor any of our decisions supports such a proposition.

With regard to the damages that might be recoverable if an insurer failed to adequately investigate a claim, we indicated in *Stoker*[46] that failure to properly investigate a claim is not a basis for obtaining policy benefits. We did recognize, though, that there might be liability for damage to the insured other than policy benefits or damages flowing from the denial of the claim if the insured mishandled a claim. We said: "We do not exclude, however, the possibility that in denying the claim, the insurer may...cause injury independent of the policy claim."[47] The concurring Justices in *Stoker* agreed that the manner in which a claim is investigated must be the proximate cause of damages before there could be a recovery.[48] Castañeda and the dissent fault Provident American's investigation of the claim and claims-handling procedures on a number of counts, but none of the actions or inactions of Provident American was the producing cause of any damage separate and apart from those that would have resulted from a wrongful denial of the claim, as we discuss in Part IV.B below.

## A

Provident American failed to respond to certain letters and phone calls during 1992,

---

**41.** *State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42 (Tex.1998).

**42.** *See Nicolau,* 951 S.W.2d at 448–50.

**43.** *See Simmons,* 963 S.W.2d at 45–47.

**44.** *See* Appendix A, Question 1.

**45.** TEX. INS.CODE art. 21.21–2, § 2(b)(5).

**46.** *See Republic Ins. Co. v. Stoker,* 903 S.W.2d 338, 341 (Tex.1995).

**47.** *Id.*

**48.** *Id.* at 342, 345 (Spector, J., concurring).

which was many months after Denise Castañeda's surgery. Guillermo Castañeda, Sr. continued to contact Provident American long after the claim had been denied a second time and after there already had been extensive correspondence among Provident American, Castañeda's father, and her physicians. Provident American had sent a letter on December 12, 1991 to Guillermo Castañeda, Sr. explaining the thirty-day waiting period and stating that "[u]pon receipt of the necessary information, we will gladly reopen this claim for possible disbursement of benefits." Provident American subsequently received additional information, including the letter from Guillermo Castañeda, Sr. described in detail in Part III.A above, and more correspondence from Denise Castañeda's physicians. As we have seen, none of this information indicated that HS first manifested within the three-day window between the expiration of the thirty-day period and the day Castañeda was diagnosed with HS. In fact, all information indicated the opposite.

The result of the activity that occurred after Provident American's December 1991 letter was that the claim still was not paid, and the physicians were told by Provident American that it would not be paid. While Provident American may not have communicated directly with the Castañedas, and its conduct is less than exemplary, this does not amount to "failing to adopt and implement reasonable standards for prompt investigation of claims" or "failing to acknowledge with reasonable promptness pertinent communications with respect to claims." [49]

■ Under Castañeda's theory, a carrier would be liable *if it did not respond to each* and every request for payment or inquiry by an insured or the insured's physician sent *after* the claim had been denied and the reasons for the denial had been explained. Nothing in the DTPA nor the Insurance Code imposes liability on such a basis.

**49.** *See* Appendix A, Question 1, subparts H and I.

**50.** *See Stoker,* 903 S.W.2d at 341.

### B

Provident American contends and we agree that its conduct in handling the claim did not cause any injury independent of the denial of policy benefits. The only damages awarded by the jury that were not policy benefits were for loss of credit reputation. But any loss of credit reputation stemmed from the denial of benefits, not from any failure of Provident American to communicate with Castañeda or to properly investigate her claim. Generally, loss of credit reputation would not flow from "some act, so extreme" by the carrier in denying the claim that it caused "injury independent of the policy," as contemplated in *Stoker.*[50]

■ Moreover, there is no evidence of lost credit reputation in this case. Denise Castañeda testified that she had applied for credit cards and was turned down. This evidence is legally insufficient. As we recently held in *St. Paul Surplus Lines Insurance Co. v. Dal–Worth Tank Co.,* " '[t]o prove that credit rating is harmed is to prove nominal damages; not until a loan is actually denied or a higher interest rate charged is there proof of actual damages which may be compensated.' " [51] We explained that there must be a showing that the inability to obtain a loan "resulted in injury and proof of the amount of that injury." [52] There is no evidence of this character before us.

### V

■ Denise Castañeda contends that by pre-approving her surgery, Provident American represented that her condition was covered, and that when Provident American thereafter failed to pay her claim, this amounted to a violation of the Insurance Code and the DTPA. The pre-approval in this case was not a representation that is actionable under the Insurance Code or the DTPA. Nor is there any evidence that Castañeda relied on the pre-approval to her detriment.

**51.** 974 S.W.2d 51, 53 (Tex.1998) (quoting 5 Cunningham, Corbin on Contracts § 1007 (Supp.1998)).

**52.** *Id.*

At the time Provident American authorized surgery, it had not been given material facts that were in the possession of the Castañedas and the physicians who treated Denise Castañeda. Provident American did not know that Denise Castañeda had exhibited symptoms and had been treated for jaundice and hepatitis long before her father applied for the policy. Nor did it know that the hereditary disease HS had been diagnosed in another family member within the thirty-day waiting period or that Denise Castañeda's brother, Guillermo, Jr., also an insured, had been treated for jaundice, suspected hepatitis, and anemia just two days before their father met with Provident American to apply for this policy. Under these circumstances, Provident American's pre-authorization at most amounted to an uninformed conclusion on its part, based on what it knew from the insured and the insured's physicians, that Castañeda's blood disorder was a covered sickness, namely, that HS had not manifested prior to the end of the thirty-day waiting period or was not otherwise excluded. The pre-approval does not constitute a false, misleading, or deceptive act; a misrepresentation of the terms of an insurance policy; or an assertion with respect to insurance that was untrue.

Castañeda's position, if accepted, would impose strict liability on carriers that are not given pertinent facts before a procedure is pre-approved and who later learn that they have a good faith, reasonable basis for denying coverage. We do not hold today that pre-approval of medical procedures can never constitute an actionable representation under article 21.21 or the DTPA. And we are not called upon to consider any other theory of liability. We hold only that the pre-approval given in this case does not subject Provident American to liability under the DTPA or article 21.21 because neither the insureds nor their physicians imparted key facts before the pre-approval was given.

■ Provident American also contends and we agree that there is no evidence that Castañeda relied on the pre-approval to her detriment. There is no evidence that but for the pre-approval, Castañeda would not have had the surgery. The evidence at trial was that removal of the spleen is the only known cure for HS. Castañeda never offered any evidence that she would have foregone the surgery if her insurer had not pre-approved it. This case is similar to the situation presented in *Royal Globe Insurance Co. v. Bar Consultants, Inc.,*[53] in which a bar was damaged by vandals. The insured called the insurer the next morning and was told that the loss was covered and to go ahead and have the damage repaired. The policy in fact expressly excluded loss caused by vandalism.[54] We held that no detriment was shown from reliance on the insurer's post-loss representation of coverage because the bar's owner conceded that he would have made the repairs even if there were no coverage.[55] The representation of coverage by Provident American, like the representation in *Royal Globe,* will not support the judgment in this case because there is no evidence of reliance by the Castañedas.

## VI

■ Two other liability issues were submitted. Question 3 inquired if Provident American had engaged in unconscionable conduct as defined in former DTPA section 17.45(5).[56] Castañeda argues that the same evidence that she contends supports findings of liability under Question 1 is also evidence of unconscionability. But none of the evidence regarding the manner in which Provident American handled the claim nor the reasons for its denial of the claim amount to evidence that Provident American took "advantage of the lack of knowledge, ability, experience, or capacity" of Castañeda to a grossly unfair degree or that its conduct resulted in a "gross disparity between value

53. 577 S.W.2d 688 (Tex.1979).

54. *Id.* at 690–91.

55. *Id.* at 694–95 (distinguishing pre-loss representations, which were actionable, from post-loss representations, which were not actionable).

56. *See* Act of May 10, 1977, 65th Leg., R.S., ch. 216, § 1, 1977 Tex. Gen. Laws 600, 600, *amended by* Act of May 19, 1995, 74th Leg., R.S., ch. 414, § 2, 1995 Tex. Gen. Laws 2988, 2989.

received and consideration paid," which were the definitions of unconscionability in Question 3. The only additional argument Castañeda makes regarding unconscionability is that her father paid the specified premium for this policy but that the policy was valueless because her claim was denied. Of course, if the policy did cover her claim, she was entitled to recover policy benefits, and the policy was not "valueless." If the policy did not cover this claim, it was still not valueless because it covered a myriad of other illnesses Castañeda could have contracted while the policy was in effect. Likewise, there is no evidence to support the findings under Question 4, which inquired if Provident American had made representations that goods or services had characteristics they did not have or were of a particular quality, or that an agreement conferred rights that it did not contain.

In sum, there is no support in the evidence for any of the extra-contractual claims on which Denise Castañeda obtained findings. Castañeda did not plead and did not obtain a determination from the trial court that Provident American was liable for breach of the insurance contract. Accordingly, there is no basis on which Castañeda may recover based on this record.

\* \* \* \* \*

Because the judgment against Provident American is not supported by legally sufficient evidence, the judgment of the court of appeals is reversed, and judgment is rendered that Castañeda take nothing.

JUSTICE ENOCH filed a concurring opinion.

JUSTICE GONZALEZ filed a dissenting opinion, in which JUSTICE SPECTOR joined.

JUSTICE HANKINSON did not participate in the decision.

Appendix A

Question 1 read:

Did PROVIDENT AMERICAN INSURANCE COMPANY engage in any unfair or deceptive act or practice that was a producing cause of damages to DENISE CASTAÑEDA?

"Unfair or deceptive act or practice" means any of the following:

A. Engaging in any false, misleading, or deceptive act or practices.

"False, misleading, or deceptive acts or practices" means an act or series of acts that have the tendency to deceive an average ordinary person, even though that person may have been ignorant, unthinking, or gullible; or

B. Making or causing to be made any statement misrepresenting the terms, benefits, or advantages of an insurance policy; or

C. Making, or directly or indirectly causing to be made, any assertion, representation, or statement with respect to insurance that was untrue, deceptive, or misleading; or

D. Omitting any information or making any false implication or impression that was either misleading or deceptive or had the capacity to be misleading or deceptive; or

E. Making any misrepresentation relating to insurance.

"Misrepresentation" means any of the following:

1. any untrue statement of a material fact; or

2. any failure to state a material fact that is necessary to prevent the statements from being misleading, when these statements are considered in the light of the circumstances under which they are made; or

3. the making of any statement in such manner or order as to mislead a reasonably prudent person to a false conclusion of a material fact; or

4. any material misstatement of law; or

5. the failure to disclose any matter required by law to be disclosed.

F. Knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages at issue; or

G. Denying a claim or delaying payment on a claim without a reasonable basis or failing to determine whether there is any reasonable basis for the denial or delay; or

H. Failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies; or

I. Failing to adopt and implement reasonable standards for prompt investigation of claims arising under its policies; or

J. Not attempting in good faith to effectuate a prompt, fair, and equitable settlement of a claim when liability has become reasonably clear; or

K. Compelling policyholders to institute suits to recover amounts due under its policies by offering substantially less in the amounts ultimately recovered and suits brought by them.

Answer "Yes" or "No".

Answer: *yes*

If your answer to Question Number 1 is "Yes," then answer the following Question. Otherwise, do not answer the following Question.

Question 3 read:

Did PROVIDENT AMERICAN INSURANCE COMPANY engage in any unconscionable action or course of action that was a producing cause of damages to DENISE CASTAÑEDA?

An "unconscionable action or course of action" is an act or practice that, to a person's detriment, either-

a. takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree or

b. results in a gross disparity between value received and consideration paid in a transaction involving transfer of consideration.

Answer "Yes" or "No."

Answer: *yes*

Question 4 read:

Did PROVIDENT AMERICAN INSURANCE COMPANY engage in any false, misleading, or deceptive act or practice that was a producing cause of damages to DENISE CASTAÑEDA?

"False, misleading, or deceptive act or practice" means any of the following:

a. Representing that goods or services had or would have characteristics that they did not have; or

b. Representing that goods or services are or will be of a particular quality if they were of another; or

c. Representing that an agreement confers or involves rights that it did not have or involve.

Answer "Yes" or "No."

Answer: *yes*

ENOCH, Justice, concurring.

I join the Court's judgment. Because I do not agree with the Court's analysis in part V, I write separately.

I agree with the Court that misrepresenting coverage might be a basis for imposing liability under the DTPA and the Insurance Code in another case.[1] But both the Court and the dissent incorrectly presume that preapproval constitutes, per se, an independent "representation." To the contrary, preapproval cannot have any legal significance apart from the underlying contract.

Preapproval, generally, is nothing more than an iteration of the coverage already contracted for. What Castañeda really questions is whether Provident's preapproval estops it from relying on the contract's other terms. That is, did Provident, by preapproving surgery, waive its rights to rely on the explicit terms of the insuring agreement? I think not.

Let me give an example. Suppose Smith and Jones enter a contract on June 1 by which Smith agrees to buy Jones's car on July 1, but only if Jones owned the car on June 1. Then, on June 15, Jones calls Smith and asks, "You're still going to buy my car, aren't you?" To which Smith replies, "Yes, I'm buying your car." July 1 comes and

---

1. *See* 988 S.W.2d at 200.

Jones tenders a car, but the car was not owned by Jones on June 1. Therefore, Smith refuses to pay.

Does Jones have a fraud/misrepresentation claim based on Smith's June 15 oral statement that he would buy the car? Surely not. One could hardly argue that Smith's statement deprives him of the right to assert the conditions of the contract at the risk of being sued for a misrepresentation. If Jones has a cause of action, it is at best for breach of contract.

Insurance policies are contracts subject to interpretation under general contract principles.[2] Provident's "representation" to Castañeda about the contract (*i.e.*, preapproval) does not preclude it, at the risk of being sued for misrepresentation, from relying on the contract.

\* \* \* \* \*

Provident's preapproval was not an independent "representation" under the Insurance Code. Consequently, the Court errs in presupposing that it was. With these remarks, I join all but part V of the Court's opinion, and I join the Court's judgment.

Justice GONZALEZ, joined by Justice SPECTOR, dissenting.

I dissent from the Court's opinion and judgment because it turns the no-evidence standard on its head. The Court ignores important evidence that supports the judgment, emphasizing evidence and indulging inferences contrary to the verdict, and resolves all conflicts in the evidence against the verdict. I would affirm the judgment of the court of appeals.

I

In order to put my disagreement with the Court's opinion in context, the following recitation includes facts favorable to the jury verdict which the Court chooses to ignore. In May 1991, Guillermo Castañeda applied for a health insurance policy for his family, including his wife, Amparo Castañeda, and their children, Guillermo Jr., Thania, and Denise Castañeda. Provident American Insurance Co. (Provident) issued the policy with an effective date of June 17, 1991. On July 14, 1991, the Castañedas learned that Amparo's brother had been diagnosed with a condition called hemolytic spherocytosis (HS), a genetic condition causing misshapen blood cells. The spleen destroys the blood cells, often causing anemia and jaundice. The Castañedas were advised that any of their children with yellowish skin tone should be tested. Guillermo Jr. had a yellow skin tone and recently had been diagnosed with anemia, which seemed to cure itself with rest. Denise seemed healthy and had not seen a doctor in years. She was active in sports, marching band, and aerobics. Her skin coloring was yellowish like her father, thus they decided to have Guillermo Jr. and Denise Castañeda tested. On July 18 1991, a Dr. Gutierrez saw Guillermo Castañeda, Jr., but was unable to diagnose the condition and referred the Castañedas to a specialist, Dr. Canales. On July 20, 1991, Dr. Canales diagnosed HS in both children.

Ms. Castañeda's doctors decided to treat the condition by removing her spleen. Her surgeon's assistant called Provident and obtained pre-approval for the surgery. Ms. Castañeda underwent surgery on August 6, 1991. A preoperative evaluation revealed she had gallstones. While removing her spleen, the surgeon decided to remove her gallbladder also.

Two weeks later, her father submitted a claim for the medical bills and expenses from the surgery. Provident responded in October 1991 that no benefits would be paid "at this time," because gallbladder conditions treated during the first six months from the effective date of the policy were excluded from coverage. In October and November 1991, Dr. Canales wrote Provident letters explaining that he only diagnosed Ms. Castañeda when he examined her for the first time on July 20, 1991, and that the gallbladder problems were secondary to HS.

On December 12, 1991, the claims department again wrote a letter to Mr. Castañeda

**2.** *See, e.g., Balandran v. Safeco Ins. Co.,* 972 S.W.2d 738, 740–41 (Tex.1998); *National Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995).

stating that the company would not pay the claim. In the letter, Provident no longer relied on the six-month exclusion. Instead it referred to the policy provision precluding coverage for an illness or disease manifesting itself less than thirty days after the policy date and noted that Dr. Canales' records indicated a history of jaundice and hepatitis. The letter continues:

We will need complete office records from Dr. Canales to evaluate Denise's claim. We also need to know of any other physicians who may have treated Denise, to establish a definite date of onset for this illness.

Upon receipt of the necessary information, we will gladly reopen this claim for possible dispersement of benefits.

In January 1992, Dr. Canales again wrote Provident, reiterating the date he diagnosed HS. Mr. Castañeda also wrote explaining the events leading up to the diagnosis of his daughter's illness and subsequent treatment, supported with correspondence from the doctors. Despite its representation in December that it would reopen the file upon receipt of such information, Provident neither acknowledged the letters nor reopened the file.

In February 1992, Mr. Castañeda called Provident to check the status of his claim. An employee in the claims department told Mr. Castañeda that he should have a response in about two weeks. In March 1992, the operating surgeon wrote Provident asking it to reconsider denial of benefits because Ms. Castañeda had no gallbladder symptomology, and the HS was not diagnosed until Dr. Canales examined her. Provident never responded to either Mr. Castañeda's or the surgeon's communications.

Finally, Mr. Castañeda complained to the Texas Department of Insurance. It directed Provident to respond to Mr. Castañeda's complaints. The president of the company, Robert Clines, replied to the Department of Insurance in a letter dated April 15, 1992. In it he claimed that Ms. Castañeda had a medical history similar to her brother, who had symptoms of HS. The letter concluded, "The policy contract specifies that the origin of symptoms is evidence of the existence of an illness under both the pre-existing condi-

tion and thirty-day sickness limitations." Despite these representations to the Department of Insurance, however, in July 1992, Provident was still telling Dr. Canales that the reason for denying Ms. Castañeda's claim was the six-month waiting period for a disease involving the gallbladder.

The testimony about how Provident handled the claim internally is confusing at best. Its witnesses could not agree whether it denied the claim because of a preexisting condition, the thirty-day manifestation period, or the six-month exclusion for gallbladder conditions. With the exception of its president, all of Provident's witnesses testified that the October 1991 rejection of the claim as a condition involving the gallbladder was improper.

Provident treated Mr. Castañeda's and Dr. Canales' subsequent communications as an appeal of the initial denial, which went to Laurie Haggard, the assistant claims department manager. She testified that the October 1991 letter denying the claim because of involvement of the gallbladder was "incorrect." Although she had never heard of HS before she reviewed the denial, she did not consult Provident's in-house medical staff before sending the December 1991 letter raising the thirty-day manifestation issue. She said that probably no one else at the company sought medical advice either, or else it would have been noted in the file. Haggard decided to deny Guillermo Jr.'s claim, but "felt like we needed some additional information" for Denise Castañeda. Haggard said she did not know when Ms. Castañeda's condition manifested. She did not know how it manifested. She thought that there might be records from Dr. Juarez which would show that the claim was not covered. However, Provident never asked specifically for those records. Haggard agreed that "you have to have proof" to deny a claim and that it was improper for Provident to fail to follow up on its request for more information, but "that's just the way it happened on this particular claim."

The director of operations, Ann Russell, thought the denial of the claim was "clear-cut" because it occurred so close in time to

the effective date. She first testified that the company properly denied coverage for non-disclosure of a preexisting condition. After reviewing the claims file on the witness stand, however, she admitted that the claim was never denied for that reason. She then asserted that the claim was properly denied because of the thirty-day manifestation exclusion stated in the December 1991 letter. Ms. Russell testified that she "would have probably been the final arbiter to deny this claim," but had never heard of HS before the Castañedas' cases, and did not consult the company's medical director.

The insurance expert witness for Provident asserted that the December 1991 letter was not a denial but merely a request for more information. He testified that if a company did not have enough information on hand to deny a claim, it could not do so merely on its surmise that there might be other evidence out there that would support denial. Provident's medical expert, an hematologist, testified that HS is a rare condition requiring special expertise to diagnose.

The president of the company testified that the December 12, 1991 letter was not a denial,, but a "special letter" seeking more information. Later in his testimony, however, he asserted that the letter *was* a denial. He testified that he "ultimately" consulted the company's staff doctor, although the consultation was not reflected in any of the company's files as was customary company practice. The doctor died prior to this litigation. The president also said he consulted a medical treatise on the subject. However, he never said when he first reviewed the claim. It must have been after the denial in December 1991, since the operations manager said she had the final say. The more reasonable inference is that the president of the company did not review the claim until the Department of Insurance demanded a response.

After hearing this evidence, the jury returned a verdict generally favorable to Ms. Castañeda. The jury failed to find that Ms. Castañeda's illness manifested itself within the excluded time frame. The charge reads:

Do you find from a preponderance of the evidence the HEMOLYTIC SPHEROCY-TOSIS of Plaintiff, DENISE Castañeda, first manifested itself prior to July 17, 1991?

You are instructed that under the policy a covered "sickness" is an illness or a disease of a member of the family group which first manifests itself more than thirty (30) days after the policy date.

Your are further instructed that "Manifestation" does not necessarily mean the time at which a covered sickness is medically diagnosed.

Answer: "Yes" or "No"

Answer: *no*

The jury found bad faith and various DTPA and Insurance Code violations including: engaging in false, misleading, or deceptive acts or practices; making representation with respect to insurance that was untrue, deceptive, or misleading; knowingly misrepresenting pertinent facts or policy provisions relating to coverages at issue; failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies; and failing to adopt and implement reasonable standards for prompt investigation of claims arising under its policies.

Based on the favorable jury findings, the trial court rendered judgment in favor of Ms. Castañeda. The court of appeals affirmed the judgment except for a twelve percent penalty for failure to pay the claim within 30 days. 914 S.W.2d 273. It held that Ms. Castañeda had private causes of action under the DTPA for failing to settle the claim in good faith and failing to acknowledge the insured's communication promptly and held that the evidence was legally and factually sufficient to support the judgment.

## II

The Court sustains Provident's no evidence points by relying on evidence contrary to the jury's verdict, calling it "undisputed". However, even if some testimony is not directly contradicted, it may still conflict with other evidence in the record, and there may still be a fact question on the ultimate issues. The Court fails to carefully articulate rules governing when and for what purpose it may consider evidence contrary to a verdict and

thus creates more confusion about the "no evidence" standard.

Our recent writings on legal insufficiency have caused concern that perhaps we have fundamentally altered no-evidence review. *See generally,* Powers, *Judge and Jury in the Texas Supreme Court,* 75 Tex. L.Rev. 1699 (1997); Gallagher & Vaught, *Factual and Legal Sufficiency in the Texas Supreme Court: A Debate, in* STATE BAR OF TEXAS PROF. DEV. PROGRAM, ADVANCED CIVIL APPELLATE PRACTICE COURSE, X (1996). An analysis of the legal sufficiency of evidence, properly conducted, is a perfectly legitimate means for addressing pure legal questions. However, when we review legal sufficiency, we must make it abundantly clear that we are not merely reweighing the evidence contrary to the constitutional limits on our authority. *See* TEX. CONST. art. V, § 6. When we rely on evidence contrary to the verdict to overturn it, we must carefully explain how our analysis fits within the framework of legal sufficiency standards of review.

We have repeatedly held that an appellate court reviewing no evidence complaints may consider only the evidence and inferences that tend to support the finding and must disregard all contrary evidence and inferences. *See, e.g., Continental Coffee Products v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Brown v. Edwards Transfer Co., Inc.,* 764 S.W.2d 220, 223 (Tex.1988); *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex.1976); *see generally* Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 364 (1960). In other cases, however, we have stated broadly that all evidence may be considered in a no evidence review. *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Merrell Dow Pharmas., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), cert. denied, — U.S. —, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). The apparent conflict has led one commentator to conclude that our court has expanded the scope of review and considers all evidence in a no-evidence challenge. *See* Hall, *Standards of Review in Texas,* 29 ST. MARY'S L.J. 351, 478–79 (1998).

We have never overruled *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965), or *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (Tex.1951), or the legion of opinions that rely on them. However, they oversimplify legal sufficiency review. There are circumstances in which we must consider evidence contrary to the verdict for a specific purpose within our constitutional limitations. To identify those exceptions, it is helpful to recall the circumstances in which a legal insufficiency challenge succeeds. We will sustain a legal sufficiency point when:

> (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of a vital fact.

*Merrell Dow Pharms., Inc.,* 953 S.W.2d at 711. When there is an absence or mere scintilla of evidence to support jury findings, a no-evidence point should be sustained regardless of evidence to the contrary. Thus, in the first and third situations, considering evidence contrary to the verdict serves no legitimate purpose.

In the second situation, it may be necessary to consider evidence unfavorable to the verdict to know that certain offered evidence is incompetent. For example, a witness may reveal on voir dire that prior testimony was hearsay or otherwise incompetent.

In the fourth situation, obviously it is impossible to conclusively establish the opposite of a vital fact without considering evidence contrary to the verdict. A reviewing court first looks for evidence supporting the jury's failure to find, disregarding all evidence to the contrary. If there is no such evidence, then the court may look to the entire record to decide if the proposition is established as a matter of law. *See Holley v. Watts,* 629 S.W.2d 694, 696–97 (Tex.1982).

Finally, we have had to particularize our review to certain issues which are not amenable to standard no-evidence rules. A finding of bad-faith is one such issue, at least as we defined the tort before 1997, because it must be supported by some evidence of a complete absence of a reasonable basis for denying the

claim. *See Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 600 (Tex.1993), *modified by Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48 (Tex.1997) (redefining the tort of bad faith). We concluded that the only way an appellate court can determine if there was a complete absence of a reasonable basis for denial is to first identify the possible bases raised by the facts of the case, before applying traditional no-evidence rules:

> A legal sufficiency analysis requires the reviewing court to give weight only to evidence supporting the judgment for the insured and reject all evidence to the contrary. However, only after an appellate court has determined what potential basis an insurance company may have had for denying a claim can the court conduct a meaningful review of whether the insured has presented evidence that the insurer lacked a reasonable basis for denying or delaying the claim. The court may then apply the traditional rules of legal sufficiency review, giving weight only to evidence in support of the judgment.

*National Union Fire Ins. Co. v. Dominguez,* 873 S.W.2d 373, 376 (Tex.1994).

Thus, at least for pre-*Giles* cases, there are three steps for reviewing bad-faith findings. First, we must isolate the possible reasonable bases the insurer may have had for denying the claim. This inquiry requires that we look at all evidence, whether it favors the judgment or not. Second, we must determine if the insured presented evidence that the insurer lacked a reasonable basis for denying the claim and that it knew or should have known it had no reasonable basis for its actions. It is at this point that we must return to "traditional rules of legal sufficiency review, giving weight only to evidence in support of the judgment." *Dominguez,* 873 S.W.2d at 376. Third, we review whether the insurer has conclusively established the opposite of a vital fact.

In this case, the facts, circumstances, and pleadings suggest three possible bases for denying the claim, all arising from the policy. They are the insuring clause, which defined a covered sickness as one manifesting more that thirty days after the effective date, the exclusion for diseases involving the gallblad-

der, and the exclusion of preexisting conditions. The second step is to review whether Ms. Castañeda presented evidence that Provident lacked a reasonable basis for denying or delaying the claim, and that it knew or should have known that it lacked a reasonable basis. Provident's own witnesses testified that they denied the claim without a reasonable basis. They contradicted each other about why the claim was denied, when it was denied, or even if it ever had been denied at all. The evidence most favorable to the verdict is that a low-level clerk erroneously rejected the claim in October 1991. By December, Provident knew its error but asserted a new excuse for denying the claim, even though it knew it did not have enough information to legitimately deny on that basis. Although it promised to reconsider, it simply turned a deaf ear to all further attempts by the insured to get a straight answer.

The Court justifies giving no weight to evidence supporting the verdict by considering what it calls "unchallenged" and "undisputed" evidence to the contrary. As one example, it says that the testimony of Laurie Haggard, who said she authorized denial of the claim when the file would not justify denial, if put in "context," shows that she concluded that the claim was not covered, and that additional information received afterwards did not show the HS manifested "during the three-day window." Haggard's testimony, in essence, is that she had a hunch the claim was deniable which would be borne out if the company ever received the records of a "Dr. Juarez." While Provident received additional letters and records, they were largely duplicative of what it already had. Haggard already knew about the maternal uncle and that Ms. Castañeda had a history of jaundice in the past. The Court does not say what information Provident learned after December 17 that made the difference between a reasonable and unreasonable denial.

Haggard's testimony that the information in the company's file was insufficient to deny the claim is, I would think, some evidence that Provident violated the duty of good faith, defined in the charge as "[d]enying a claim or delaying a claim without a reason-

able basis or fail[ing] to determine whether there is any reasonable basis of the denial or delay...." If the Court today cannot recognize the evidence of bad faith in this case, I am not sure what quantum of evidence it will take in the future for this Court to affirm a judgment based on the tort of "bad faith."

The Court appears to view the above evidence as merely sloppy claim handling practices that caused no harm. Instead of analyzing whether there is evidence of bad faith as defined in the charge, it gives the impression that Ms. Castañeda was required to prove when HS manifested within an artificially created three-day window between the thirtieth day of the policy and the day HS was diagnosed. I agree that a claim that is *in fact* not covered by the policy will not support a bad faith suit even if the insurer gave the wrong reason. *See Republic Ins. Co. v. Stoker,* 903 S.W.2d 338, 341 (Tex.1995). However, Provident's brief to us does not argue that it conclusively established lack of coverage. It does not challenge the jury's failure to find that HS manifested within 30 days from the effective date of the policy which the Court now holds was established as a matter of law. Provident cites *Stoker* only in its overall argument that the company had a reasonable basis for denial.

### III

I would hold that Ms. Castañeda's condition was covered because it had not manifested within the thirty-day exclusionary period. Our Court has not written on the subject, but a secondary authority has defined a general rule for when an illness has its inception: "an illness is deemed to have its inception when it first becomes manifest *or* active *or* when there is a *distinct* symptom or condition from which one learned in medicine can *with reasonable accuracy* diagnose the illness." John C. Williams, Annotation, *Construction and Application of Provision in Health or Hospitalization Policy Excluding or Postponing Coverage of Illness Originating Prior to Issuance of Policy or Within Stated Time,* 94 A.L.R.3d 990, 998 (1979) (emphasis added). Another authority agrees that there is a general rule for *inception* of disease, but does not agree that *manifest* has a uniform meaning:

> While the general rule [about inception of disease] is widely if not unanimously recognized, there is no unanimity as to exactly what constitutes manifestation of a disease. The rule varies state to state, if not from case to case.

WILLIAM F. MEYER, LIFE AND HEALTH INSURANCE LAW § 17:6 (1972). An examination of state supreme court cases reveals that Meyer is correct, and that any semblance of a majority rule for manifestation is illusory. It is important to note not only how a court in a particular case defines insuring clauses and pre-existing condition exclusions but how it applies the definitions to the facts of the case.

For example, in a 1975 case, the Supreme Court of Mississippi adopted the standard formulation, that a "disease will ordinarily be deemed to exist when a distinct symptom, ailment or condition manifests itself from which a doctor can with reasonable accuracy diagnose the disease." *Blue Cross & Blue Shield v. Mosley,* 317 So.2d 58, 61 (Miss. 1975). In a later case, it clarified:

> [A] disease or condition would have had to manifest itself in some way to the insured in order for the insurer to deny coverage. Not only must the physical condition or disease exist prior to the effective date of coverage under such an exclusion, it was also for the insurer to show a manifestation of it to the insured prior to date of becoming insured.

*Mississippi v. Carper,* 545 So.2d 1, 2–3 (Miss.1989).

The Supreme Court of Washington has held that "a condition does not become manifest until it is known." *Hovis v. Industrial Hosp. Ass'n,* 71 Wash.2d 169, 426 P.2d 976, 977 (Wash.1967). In that case a major medical and hospital policy provided coverage for "physical illnesses, unless specifically excluded, which become manifest or have their original date of onset after Membership hereunder has been continuously effective for thirty or more days." *Id.* The insured underwent surgery for vascular disease about a year after the effective date of the policy. However, the insured had suffered with pain

and cramps in his legs and hips for several years. An expert testified that if the insured had been examined by a vascular specialist five years earlier, the condition would have been discovered, but without such an expert examination it would not. The defendant argued that the test should be whether one learned in medicine could have diagnosed the condition with reasonable accuracy. The supreme court approved of the trial court's answers to the argument:

> To adopt any other rule would make this type of coverage substantially worthless. When the company doesn't require a medical examination as a condition precedent it would put the burden upon the insured to have his own medical examination, at his own risk, and I don't think that's the intention of these policies at all.
>
> . . . .
>
> [I]t is inconceivable and would shock conscience that a health insurance company could escape liability in that way, and I can't believe it's the law. There's some language in some decisions in other states that might be taken to indicate that, but I don't think that is the law, I don't think it would be intended to go this far.

*Id.* at 977.

The Supreme Court of Oregon has focused on whether the insured knew or should have known of a pre-existing condition. *See Evans v. Investors Ins. Corp.*, 272 Or. 257, 536 P.2d 506 (Or.1975). The policy in that case defined a covered sickness as one "which first manifests itself 30 or more days after this policy has been in force." *Id.* at 507. Within 30 days of the effective date, the insured was told by an army doctor at a preinduction physical that he had a slight varicocele of his left testicle, although the doctor said he was not sure. The insured later had surgery for an inflamed varicocele, and the insurance company rejected the claim. The Oregon court defined manifest as meaning "to show plainly" or "to put beyond question or doubt," and held that the army doctor's equivocal diagnosis did not constitute a manifestation of the condition. *Id.* at 508.

The Supreme Court of Nebraska has applied a reasonable-insured test. *See Fu-*glsang v. Blue Cross, 235 Neb. 552, 456 N.W.2d 281 (Neb.1990), *overruled on other grounds*, 249 Neb. 789, 545 N.W.2d 727, 735–36 (Neb.1996). Several months before the effective date of the policy, the insured in that case complained to the family physician that she had difficulty swallowing, chewing, and moving her tongue and weakness in her arm and leg muscles. She was diagnosed after the policy date with myasthenia gravis by a Tensilon test. The court upheld the jury's verdict for the insured, holding that "'A condition, not otherwise diagnosed, is manifest when the insured knew or should have known of the existence of his illness because he was experiencing symptoms that would lead a reasonable person to seek a medical diagnosis.'" *Id.* at 284 (quoting *American Sun Life Ins. Co. v. Remig*, 482 So.2d 435 (Fla.App.1985)).

In *Kissil v. Beneficial National Life Insurance Co.*, 64 N.J. 555, 319 A.2d 67, 70 (N.J.1974), the Supreme Court of New Jersey did not formulate a test but held that a disease would be "contracted and commencing" only if symptoms manifest themselves with reasonable certainty. In that case a child was born and immediately diagnosed with a condition of meconium ileus and presumptively diagnosed with cystic fibrosis. After the coverage date fifteen days later, he was conclusively diagnosed with cystic fibrosis, an inherited disease present at birth. The defendant's medical expert testified that meconium ileus is conclusively indicative of cystic fibrosis. The plaintiff's expert testified that not all babies born with meconium ileus become cystic. The supreme court held that the issue of whether cystic fibrosis commenced prior to coverage was an issue properly left to the jury because of the conflicts in the evidence and inferences that could be drawn from it. *Id.*

A number of courts have adopted what appears to be a broad definition of manifestation, but it is not clear how they would rule on facts such as those in the case before us today. In most of those cases, the insureds appear to have been suffering from symptoms from which they knew they had an illness. In *Dirgo v. Associated Hosps. Serv., Inc.*, 210 N.W.2d 647 (Iowa 1973), the policy

excluded existing conditions. The year before the effective date of the policy, the insured began experiencing lower abdominal discomfort which continued after surgery for a prostate infection. After the policy date, the condition was diagnosed as diverticulitis using standard medical procedures. The court upheld the trial court decision in favor of the insurer on a substantial evidence analysis. *Id.* at 651.

In *Bishop v. Capitol Life Insurance Co.,* 218 Kan. 590, 545 P.2d 1125 (Kan.1976), the issue was also whether a condition existed on the policy date. For several years before the policy date, the insured had suffered chest pains and shortness of breath. After the policy date, he was diagnosed with arteriosclerotic heart disease, and tests revealed an old scar on the wall of the heart. The court held that the heart condition was active or manifest to one learned in medicine. *Id.* at 1129.

The issue in *Southards v. Central Plains Ins.Co.,* 201 Kan. 499, 441 P.2d 808 (Kan. 1968), the issue was whether a kidney condition commonly known as Bright's disease was contracted before the policy date. The insured had been diagnosed with Bright's disease before and after the policy date, although the insured did not learn of that fact until afterwards. *Id.* at 813.

The policy in *Dowdall v. Commercial Travelers Mut. Accident Ass'n,* 344 Mass. 71, 181 N.E.2d 594 (Mass.1962), covered sicknesses "originating" more than 30 days after the effective date of the policy taken out in 1952. Although the facts are not explicit, the insured said he had experienced "trouble" with his arms and legs since 1944. The cause of his disability was multiple sclerosis. His physician testified that the symptoms appeared in 1944, that he "had reasonable cause" to believe that the condition was MS when he treated the insured in 1947 and 1948, but did not tell him he had the disease in 1952, and that a definite diagnosis was made in 1955. *Id.* at 595.

Finally, in *Richards v. American Sec. Life Ins. Co.,* 303 P.2d 1110 (Okla.1956), the policy only insured "sickness the cause of which originates while the policy is in force...." *Id.* at 1111. Before the policy date, the

insured had a cataract removed from his right eye, and his left eye was only ²⁰⁄₂₀ due to sclerosis of the lens. After the policy date, he had a cataract removed from the left eye and made a claim for the medical expenses. The defense expert testified that a sclerosis is the same as a beginning cataract. The court held that it would not overturn a jury verdict for the defendant when there was a conflict in the medical testimony. *Id.* at 1112.

Insurance policies are subject to the same rules of construction as other contracts. *See Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 823 (Tex.1997). It must be considered as a whole and effect given to each part if reasonably possible. *National Sec. Life & Cas. Co. v. Davis,* 152 Tex. 316, 257 S.W.2d 943, 944 (Tex.1953). The plain, ordinary, and generally accepted meaning of words is preferred unless the policy itself shows that the terms have been used in a technical or different sense. *See Ramsay v. Maryland Am. Gen. Ins. Co.,* 533 S.W.2d 344, 346 (Tex.1976). If an insurance contract can be given more than one meaning, it is ambiguous, and the interpretation that most favors coverage will be adopted. *See Grain Dealers Mut. Ins. Co. v. McKee,* 943 S.W.2d 455, 458 (Tex.1997). An intent to exclude coverage must be expressed in clear and unambiguous language. *See State Farm Fire & Cas. Co. v. Reed,* 873 S.W.2d 698, 699 (1993).

In the future, we should follow the lead of those courts that have applied the common meaning of manifest and conclude that a disease is manifest when it is apparent, obvious, or plain. *See, e.g., Ross v. Western Fidelity Ins. Co.,* 872 F.2d 665, 669 (5th Cir.1989), *clarified on rehearing,* 881 F.2d 142 (5th Cir.1989). In *Ross,* the Fifth Circuit Case interpreted an insuring clause virtually identical to the one in Provident's policy in which the insurer agreed to pay for medical expenses "resulting from sickness, which first manifests itself more than 30 days after the effective date...." *Id.* at 669. In that case, an infant had been born with respiratory problems and was subjected to a number of diagnostic tests, including cardiac tests. Later, after the effective date of coverage, it

was discovered the child had a congenital heart murmur. The court held:

> To be manifest, a sickness must be apparent, obvious, or plain. The heart defect here did not manifest itself during the excluded time frame. Despite the presence of symptoms that may have been caused by the heart defect, the heart defect itself was not diagnosed and therefore was not apparent, obvious, or plain.

*Ross*, 872 F.2d at 669. In our case, Dr. Gutierrez was unable to diagnose Guillermo Castañeda, Jr., after the policy coverage date. No doctor Denise had ever seen before Dr. Canales even suspected HS, and to the contrary, she seemed perfectly healthy.

As one justice has stated:

> "It appears quite unfair to hold that when one takes out an insurance policy when one is unaware of any symptoms and has no symptoms manifest to the average person and later when one becomes ill, for the insurance company to refuse to pay because the company can get a medical expert or physician to testify that the insured has had a condition for many years prior to the effective date of the policy, which results in his present sickness or disability, and therefore, under the terms of the policy, the insured is not covered."

*Mutual Hosp. Ins. Inc. v. Klapper*, 262 Ind. 144, 312 N.E.2d 482, 484 (Ind.1974). Another court has observed that "a medical insurance system that covers only well persons and those sick persons who have not vigilantly monitored their health makes sense only if viewed through the looking glass." *Hardester v. Lincoln Nat'l Life Ins. Co.*, 33 F.3d 330, 339 n. 5 (4th Cir.1994) (Hall, J., dissenting) *dissenting opinion adopted on rehearing in banc*, 52 F.3d 70 (4th Cir. ), *cert. denied*, 516 U.S. 864, 116 S.Ct. 177, 133 L.Ed.2d 117 (1995).

As noted before, most courts require a *distinct* condition so that a diagnosis can be made with *reasonable accuracy*. What is the distinct symptom here? It is clear that Dr. Canales's diagnosis hinged on the fact that Denise Castañeda's maternal uncle has the genetic condition. Yet her uncle's condition is not Denise Castañeda's "distinct symptom or condition." With a pen stroke the Court

denies coverage to insureds who, unbeknown to them, suffer genetic or other congenital conditions. In this age of gene-mapping, we are rapidly reaching the point that a genetic condition is diagnosable from birth if enough diagnostic tests are run.

The policy does not state to whom the sickness must manifest itself. There is nothing in the policy to indicate that the word has the more technical meaning of being capable of diagnosis by a medical expert. We need to interpret the term manifest in a way that makes insuring for unknown risks possible, because virtually every latent illness is a "physical condition" which could be diagnosed through sophisticated testing. An insured would have to pay for every sophisticated test in existence to know what the policy actually covers.

A reasonable interpretation is that a condition is covered unless it is at least apparent to a reasonable insured that she is sick. Such an interpretation would effectuate the purposes of the insuring clause. As one court has commented,

> [W]hile insurance companies need protection from unscrupulous applicants who would fraudulently attempt to gain coverage for an illness of which they are already aware, such protection need not go so far as to consider a disease to exist at the time of its medical inception. Furthermore, to consider a disease to exist at a time when the victim is blissfully unaware of the medical "seeds" visited upon his body, is to set a trap for the unwary purchaser of health insurance policies.

*Mutual Hospital Ins., Inc. v. Klapper*, 153 Ind.App. 555, 288 N.E.2d 279, 282 (Ind.App. 1972). While this does not necessarily mean a condition must be diagnosed to be manifested, sometimes latent diseases are not manifest until diagnosis. Certainly, a disease is not manifest when the patient does not even know he or she is sick.

I would hold that a disease has not manifested itself until the insured suffers from *distinct* symptoms from which a diagnosis can be made with reasonable accuracy, *and* the symptoms are such that a reasonable insured would seek medical treatment. The

evidence shows that Ms. Castañeda was healthy and active in school and sports. Her physician said that she was asymptomatic except for a yellow tint to her skin, the same as her father. It was her maternal uncle who the Castañedas learned had HS. Thus, whether Ms. Castañeda's HS had manifested within the policy period should be a question of fact. The jury's finding that the disease had not manifested should be sustained.

## IV

I agree with the Court that it is not bad faith for an insurance company simply to make a mistake and deny a claim for the wrong reason. We so held in *Republic Insurance Company v. Stoker*, 903 S.W.2d 338, 341 (Tex.1995). However, *Stoker* does not apply because the evidence of coverage is conflicting, and should be resolved in favor of the verdict.

The Court ignores the ample evidence that Provident violated its duties to Ms. Castañeda. The *Stoker* exception does not apply because the claim was in fact covered. While policy benefits do not support the entire judgment for actual damages, I agree that the award should not be set aside for the reasons set forth by the court of appeals. 914 S.W.2d at 280–82.

## V

In summary, I disagree with the Court's conclusion that the evidence only shows "less than exemplary" claims practices or merely a bona fide coverage dispute. The record is more than adequate to support jury findings that Provident American Insurance Company violated the DTPA and the Texas Insurance Code and breached its duty to deal in good faith. I therefore would affirm the judgment of the court of appeals in all respects.

There is ample evidence from which the jury could conclude that Provident decided to deny the claim from the beginning, and asserted a series of pretextual reasons for not paying the claim. This case has serious implications well beyond the present parties. The Court's opinion may very well eviscerate the bad-faith tort as a viable cause of action in Texas. If the evidence in this case is not good enough to affirm judgment, I do not know what character or quantity of evidence would ever satisfy the Court in this kind of case.