Opinion issued August 30, 2002








 


 





In The

Court of Appeals

For The

First District of Texas






NO. 01-00-00741-CV






THE DOCTORS' COMPANY, AN INTERINSURANCE EXCHANGE, Appellant


V.


NANCY A. MCDONOUGH, Appellee






On Appeal from the 80th District Court

Harris County, Texas

Trial Court Cause No. 98-50475






O P I N I O N

 This suit arises from a health insurer's denial of health benefits based on a
"pre-existing condition" exclusion. The patient (Nancy A. McDonough) filed suit,
alleging that the insurer (The Doctors' Company, an Interinsurance Exchange): (1)
breached its contract by refusing to pay medical expenses, which she incurred while
undergoing cancer treatment, (2) acted in bad faith in denying coverage, and (3) 
misrepresented the coverage afforded by the policy. After the trial court denied the
insurer's motion for directed verdict, a jury returned a verdict for the patient, and the
trial court entered a final judgment against the insurer for $181,520.00, plus interest,
costs, and attorney's fees for appeal, if necessary. This appeal followed. We reverse
in part and affirm in part.Facts

 In January 1997, Nancy McDonough applied for insurance with The Doctors'
Company, an Interinsurance Exchange (hereinafter, "the insurer"). McDonough
needed a one year policy to apply between the date she terminated another policy and
the date she became eligible for Medicare. The insurer's policy was designed for
such short-term coverage and was automatically available if the applicant met three
qualifications: (1) the applicant must have had no other medical coverage; (2) neither
the applicant, nor anyone in their family could be pregnant; and (3) the applicant must
have been a resident of the United States for the past five years. The cost of the
policy was about half that of typical major medical policies. For reasons that are
unclear from the record, but not disputed on appeal, McDonough's policy was
cancelled and her premiums were refunded in April 1997. The insurer invited her to
"reapply for this valuable coverage."

 On May 2, 1997, McDonough visited her physician, Dr. Kathleen Gately, about
a sinus infection. At this office visit, McDonough pointed out a mass on the left side
of her neck to Dr. Gately. At trial, McDonough testified about her conversation with
Dr. Gately as follows:

 [Defense Counsel]: Well, I'm-what I'm going to ask you to do is to look
at the letter from Dr. Gately. ["]At that point she pointed out a small
mass in her left neck that she has recently noticed.["] (quoting from Dr.
Gately's letter to the insurer dated February 10, 1998).


 [McDonough]: That part is true.


 [Defense Counsel]: "The mass was somewhat hard in the cervical . . ." 
Did she identify the mass as being-


 [McDonough]: No she did not.


 [Defense Counsel]: All right. Your testimony is that she didn't do
anything?


 [McDonough]: And she did not. She did not prescribe anything. She
just said that maybe in the future to watch it, and maybe an ENT, ear,
nose and throat doctor should take had [sic] a look at it. And at that
time, I told my daughter. And she's the one that scheduled the
appointment for Dr. McDonald.


 [Defense Counsel]: All right. So Dr. Gately did say an ENT should look
at that?


 [McDonough]: The way I recall it, I believe she did. Or we had a
discussion about it. But she did not refer me to Dr. McDonald, no.


 Dr. Gately, in a letter to the insurance company, described the same
appointment as follows:

 Ms. McDonough was seen by me on May 2, 1997 for a sinusitis. 
At that point she pointed out a small mass in her left neck that she had
recently noticed. The mass was somewhat hard in the cervical area and,
because of her history of smoking, I sent her immediately to E.N.T.
where she was evaluated by Dr. Sarah McDonald. This was done on
May 14, 1997.


 The day after her appointment with Dr. Gately, on May 3, 1997, McDonough
applied for the policy at issue in this case. The application contained the following
statements: 

 I understand that the Company will not pay benefits for loss due to any
medical condition or illness for which I or any person to be insured have
received treatment in the past 24 months. 


 Health conditions which you may presently have (pre-existing
conditions) may not be immediately or fully covered under the new
policy, whereas a similar claim might have been payable under your
present policy.


 McDonough signed the application on May 3, and on May 6, three days after
McDonough saw Dr. Gately, the policy went into effect.

 The policy excluded coverage for "pre-existing conditions," which it defined
as:

 (a) Symptoms that would have caused an ordinarily prudent person to
seek medical advice, diagnosis, care, or treatment during the twelve (12)
months immediately preceding the effective date of coverage.


 (b) A condition for which medical advice, diagnosis, care, or treatment
was recommended or received from a Physician during the twenty-four
(24) months immediately preceding the effective date of coverage.


 On May 14, eleven days after pointing out the mass in her neck to Dr. Gately
and eight days after the effective date of the policy, McDonough saw Dr. Sarah
McDonald, an otolaryngologist ("ENT"). Dr. McDonald did a CT scan and
determined that the mass was 4-5 cm in diameter. In July, a biopsy revealed that the
mass was cancerous and McDonough began treatment at M.D. Anderson Cancer
Center. 

 McDonough filed claims under the policy for the cost of her treatment, which
the insurer denied, based on the pre-existing condition exclusion. This suit followed.

Breach of Contract


 In question one of the charge, the jury was asked to decide whether
McDonough's cancer was a "covered sickness" under the terms of the policy. 
Covered sicknesses excluded pre-existing conditions as defined by the policy. The
jury responded that it was, and awarded $42,380.00 based upon breach of the
insurance contract.

 In its first issue, the insurer contends that McDonough's cancer was, as a matter
of law, a pre-existing condition, as defined by the policy. We will construe this as a
challenge to the trial court's denial of the insurer's motion for directed verdict.
Directed verdict is proper when: (1) a defect in an opponent's pleadings makes them
insufficient to support a judgment; (2) the evidence conclusively proves a fact that
establishes a party's right to judgment as a matter of law; or (3) the evidence is
insufficient to raise an issue of fact. Kenneco Energy, Inc. v. Johnson & Higgins of
Tex., Inc., 921 S.W.2d 254, 259 (Tex. App.--Houston [1st Dist.] 1995), aff'd in
relevant part, 962 S.W.2d 507 (Tex. 1998). Under an issue questioning the denial of
a motion for directed verdict, the appellant must show that the record contains
evidence establishing the movant's position as a matter of law. Rivera v. Herndon
Marine Prods., Inc., 895 S.W.2d 430, 432 (Tex. App.--Corpus Christi 1995, writ
denied); Kershner v. State Bar of Tex., 879 S.W.2d 343, 346 (Tex. App.--Houston
[14th Dist.] 1994, writ denied). The appropriate inquiry when the trial court refuses
to grant a directed verdict is whether the evidence raises an issue for the jury. See
Collora v. Navarro, 574 S.W.2d 65, 68 (Tex. 1978).

 The issue in this case is not who referred McDonough to Dr. McDonald (1), but
whether Dr. Gately's statement to "maybe see an ENT" was "medical advice" within
the terms of the "pre-existing clause" of the policy.

 In Bartlett v. Am. Republic Ins. Co., 845 S.W.2d 342, 344-348 (Tex.
App.--Dallas 1992, no writ), the patient saw her doctor, who told her that she had a
mass in her left breast. Id. at 344. He also told her that she should see another doctor
for a mammogram to determine whether a biopsy was necessary. Id. The second
doctor advised the patient to wait a year before undergoing further tests. Id. During
that year, the patient obtained new insurance, which contained a "pre-existing
condition clause" similar to that in this case. (2) Id. After the new policy went into
effect, the second doctor performed further tests and determined that the patient had
breast cancer. Id. The court held that coverage was excluded under the policy, as a
matter of law, because the first doctor gave the patient "medical advice" when he
recommended that she see another doctor for a mammogram. Id. at 347. "Advice"
was defined as "an opinion or recommendation offered as a guide to action [or]
conduct." Id., quoting Webster's Encyclopedic Unabridged Dictionary of the
English Language 21 (1989). The court noted that the patient's knowledge that her
condition was cancer was irrelevant under the policy. Id. at 347. The fact that she
sought "medical advice" about a health condition before the effective date of the
policy was sufficient to trigger the exclusion. Id. at 348. The court also noted that
even though the two doctors gave differing opinions, the patient, nonetheless received
medical advice. Id. at 347. "Medical advice, although conflicting, is still medical
advice." Id.

 However, in Bartlett,the medical advice actually given was more specific--the
first doctor expressly recommended that the patient see another doctor for a
mammogram, and, in addition, told the patient she should consider removing the
lump even if it were benign. Id. at 347-48. In this case, Dr. Gately noted the
existence of the mass and then, according to McDonough's version of the facts, rather
tenuously told McDonough to "maybe watch it" or "maybe see an ENT." As such,
Dr. Gately's statements to McDonough were equivocal, as opposed to the express,
pro-active recommendation given by the doctor in Bartlett. 

 We agree with Bartlett that medical advice is "a recommendation offered as a
guide to action." See id. at 347. We further agree that a doctor's recommendation
that a patient seek further medical advice is, in and of itself, medical advice. (3) 
However, in this case, Dr. Gately's statements to McDonough to "maybe watch it"
or "maybe see an ENT" are too equivocal to constitute "medical advice," or even a
recommendation to seek further medical advice.

 Accordingly, we overrule appellant's first issue.

Extra-Contractual Claims


 McDonough also pleaded extra-contractual claims under article 21.21 of the
Texas Insurance Code and the Texas Deceptive Trade Practices Act. These claims
can be divided into two basic categories: (1) "bad faith" settlement practices, and (2)
misrepresentations made regarding coverage. (4) 

 In its second and third issues, the insurer contends there was no evidence, or
alternatively, insufficient evidence to submit the extra-contractual claims to the jury.

A. Statutory Duty of Good Faith and Fair Dealing 

 Under Article 21.21 of the Insurance Code, an insurer violates its duty of good
faith and fair dealing by denying or delaying payment of a claim when the insurer
knew or should have known that it was reasonably clear that the claim was covered. 
Universal Life Ins. Co. v. Giles, 950 S.W.2d 48, 55-56 (Tex. 1997). However, an
insurer does not breach its duty by delaying payment, when there is a bona fide
controversy as to liability. See Provident Am. Ins. Co. v. Castaneda, 988 S.W.2d 189,
193 (Tex.1998). "[A]s long as the insurer has a reasonable basis to deny or delay
payment of a claim, even if that basis is eventually determined by the fact finder to
be erroneous, the insurer is not liable for the tort of bad faith." Lyons v. Millers Cas.
Ins. Co., 866 S.W.2d 597, 600 (Tex.1993); see Castaneda, 988 S.W.2d at 193. The
key inquiry in a bad faith claim is the reasonableness of the insurer's conduct. Lyons,
866 S.W.2d at 600. Reasonableness is determined using an objective standard of
whether a reasonable insurer under similar circumstances would have delayed or
denied the claimant's benefits. Aranda v. Ins. Co. of North America, 748 S.W.2d 210,
213 (Tex.1988). 

 The issue we must decide is whether there was any evidence that the insurer's
liability in this case had become "reasonably clear," or whether the evidence merely
showed that there was a "bona fide controversy as to liability." Whether an insurer's
liability has become "reasonably clear" is a jury issue unless there is no question of
fact about the reasonableness of the insurer's action in denying the claim. See Giles,
950 S.W.2d at 56. In other words, if there was a "bona fide controversy as to
liability," the insurer's denial of coverage is reasonable as a matter of law, even if it
is later proven that coverage exists. See Castaneda, 988 S.W.2d at 193.

 In this case, the insurer had a reasonable basis for denying the claim based on
Dr. Gately's February 10, 1998 letter, in which Gately stated that she had seen the
lump in McDonough's neck and "immediately sent [McDonough] to ENT. . ." As we
pointed out in footnote 3, unequivocal advice to seek further medical advice would
have triggered the pre-existing condition exclusion under the policy. Thus, relying
on a letter from McDonough's own doctor, the insurer reasonably, albeit incorrectly, 
concluded that Dr. Gately had given McDonough medical advice regarding the
cancerous lump in her neck before the policy was issued.

 That McDonough disputed Gately's letter by testifying that Gately's "advice"
was much more equivocal than indicated in the letter, does not make the insurer's
reliance on the letter in denying coverage unreasonable. In Nat'l Union Fire Ins. Co.
v. Dominguez, 873 S.W.2d 373 (Tex. 1994), the insurer denied coverage based on a
medical opinion that the plaintiff's injury was the result of a degenerative disease,
even though another doctor had expressed the opinion that the injury was work-related. Id. at 377. The supreme court concluded that because of the conflicting
opinions, the insurer's liability was not "reasonably clear," and there was no evidence
that the insurer lacked a reasonable basis for denying the claim. Id.

 Even though we have held that, under McDonough's version of the facts, the
policy provided coverage, there was no evidence that the insurer acted unreasonably
in denying coverage based on Dr. Gately's letter. Thus, this case involved nothing
more than a bona fide coverage dispute.

 Therefore, we sustain appellant's second issue and reverse the portion of the
judgment awarding McDonough damages based on her bad faith denial of coverage
claim.

B. Misrepresentations Regarding Coverage

 In its third issue, the insurer contends that there is "no evidence that [the
insurer] misrepresented the terms, benefits, or advantages of the policy, or a material
fact or policy provision relating to coverage." In response, McDonough points to the
following statements, which she contends are actionable misrepresentations:

 1. The insurer invited McDonough to apply for "valuable coverage,"
which she argues was worthless.


 2. The definition of pre-existing condition in the policy was vastly
different from that in the application.


 3. The insurer promised that it would investigate her claim, and
represented that she had the right to appeal any denial of coverage.


 4. The insurer promised that it would have its medical director review
the pre-existing condition issue.



 1. Post-loss misrepresentations

 We begin by noting that a misrepresentation claim regarding policy coverage
may exist even in the absence of coverage. See Castaneda, 988 S.W.2d 189, 199-200; Id. at 202 (Enoch, J., concurring). Nevertheless, the alleged misrepresentation
must be a producing cause of the plaintiff's actual damages. See Tex. Bus. & Comm.
Code Ann. § 17.50(a) (Vernon Supp. 2002). A representation that is made after the
plaintiff suffers the complained of loss cannot be a producing cause of the plaintiff's
actual damages. See Castaneda, 988 S.W.2d at 200, n.55, citing Royal Globe Ins. Co.
v. Bar Consultants, Inc. 577 S.W.2d 688, 694-95 (Tex. 1979) (distinguishing pre-loss
representations, which were actionable, from post-loss representations, which were
not actionable)).

 The third and fourth representations alleged by McDonough both occurred after
she suffered her damages, and were made during the claims process. As such, there
is no evidence to show that McDonough's damages were caused by these
representations, even if they were untrue.

 2. Pre-loss representations

 Thus, we turn to the issue of whether the pre-loss representations alleged by
McDonough were actionable, i.e., whether they are legally sufficient evidence to
support the jury's finding that the insurer's misrepresentations damaged McDonough.

 First, McDonough contends that even though the insurer represented that the
coverage it provided was "valuable," it was, in fact, worthless because of the insurer's
policy of carefully screening claimant's who may have "adversely selected" it. The
insurer explained that by using the term "adversely selected," it meant that it was
careful to watch for people who were trying to obtain coverage for pre-existing
conditions by applying for this particular policy because the policy was easy to obtain
and did not require a physical.

 However, an insurer's act of carefully screening for pre-existing conditions,
while at the same time describing its coverage as "valuable" is not an actionable
misrepresentation. A policy is not "valueless" simply because it excludes coverage
for a particular illness as it still provides coverage for a "myriad of other illnesses [the
plaintiff] could have contracted while the policy was in effect." Castaneda, 988 S.W.
2d at 201.

 Second, McDonough argues that the language of the application led her to
believe that she would be covered, but the policy provided a "vastly different"
definition of "pre-existing condition." We disagree. The application does not even
include a definition of "pre-existing condition." Instead, it specifically tells the
applicant that coverage for "pre-existing conditions" will be excluded. McDonough
received exactly what she applied for; a policy that excluded "pre-existing
conditions," the definition of which is provided only in the policy. An insured is
deemed to know the contents of the contract she makes. Shindler v. Mid-Continent
Life Ins. Co., 768 S.W.2d 331, 334 (Tex. App.--Houston [14th Dist.] 1989, no writ).
A claim for misrepresentation can not stand when the party asserting the claim is
legally charged with knowledge of the true facts. Id. at 334-35. 

 Because none of the misrepresentations alleged by McDonough are actionable,
there is no evidence that the insurer misrepresented the terms of coverage to
McDonough. Accordingly, we sustain appellant's third issue and reverse the portion
of the judgment awarding McDonough damages on her misrepresentation claim. 

The Casteel (5) Issue


 In its fourth issue, the insurer contends "the trial court erred by submitting a
single broad-form liability question to the jury, which commingled valid and invalid
liability theories." Specifically, the insurer contends that the "misrepresentation"
issues should not have been submitted in the same question with the "bad faith"
issues because there was no evidence of any actionable misrepresentation. We need
not reach this issue because we have already held that there was no evidence to
support the submission of either of the issues to the jury.

Conclusion

 We reverse the portions of the judgment awarding McDonough extra-contractual damages for bad faith denial of coverage and misrepresentations
regarding coverage. However, we affirm the portion of the judgment awarding
damages for breach of contract.



 Michael Schneider

 Chief Justice


Panel consists of Chief Justices Schneider and Justices Jennings and Wilson. (6)


Do not publish. Tex. R. App. P. 47.
1. ' 
 

2. "- " - 
 
 
 
 
3. '
 
 " 
 " 
 
' "" 
 

4. ' 
 
 " " 
 "" "" ' 
 " " 
 
 
 
 
 "" "" 
5. 
6.