TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-05-00244-CV






Ramona Harris, Appellant


v.


Texas Department of Family and Protective Services, Appellee






FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT

NO. 00-0684-A, HONORABLE DONALD V. HAMMOND, JUDGE PRESIDING





D I S S E N T I N G O P I N I O N


 I agree that the trial court may not contravene the jury's finding on the issue of the
appointment of the sole managing conservator. See Tex. Fam. Code Ann. § 105.002(c)(1)(A)
(West Supp. 2006). (1) But this does not relieve us from our role in reviewing the jury's verdict for
legal sufficiency. Because the jury's verdict is legally insufficient, it is error to reverse the trial
court's order disregarding that verdict and render judgment removing this child from foster parents
with whom he has spent the last six years and sending him straightaway to a parent with whom he
has spent only a handful of hours. (2) Having lingered in foster care for six years while the legal
process determines whether he will remain with his foster parents, who have adopted his two older
brothers and sister, this child must be the paramount focus here: What is in the child's best interest? 
Legal proceedings have immutably altered his life. Were we writing on a clean slate, we would hope
to provide this child--and his parent--with what the legislature contemplated: a fair and expeditious
proceeding with security, continuity, stability, certainty, and finality at its conclusion. But the slate
is not clean.

 After a trial in October 2001, this Court in April 2003 affirmed the termination of
Harris's rights to her three other minor children, M.H., C.D., and K.D. (3) The Department alleged and
proved that the parents:


 Knowingly placed or knowingly allowed the children to remain in conditions or
surroundings which endangered the physical or emotional well-being of the children
in violation of Tex. Fam. Code Ann. § 161.001(1)(D) (West 2002), and


 Engaged in conduct or knowingly placed the children with persons who engaged in
conduct which endangered the physical and emotional well-being of the children in
violation of Tex. Fam. Code Ann. § 161.001(1)(E) (West 2002).


See Tex. Fam. Code Ann. § 161.001(1)(D)-(E). This Court observed that the rights of Ronald
Williams, M.H.'s father, were terminated, but he did not appeal; nor had Steven Dietrick, the father
of C.D. and K.D, or Cleiffort Cooks-Harris, whose rights were terminated as to the child,
C.C.H., who is the subject of the current proceeding. Harris v. Texas Dep't of Protective &
Regulatory Servs., No. 03-01-00643-CV, 2003 Tex. App. LEXIS 2842, at *3-4 (Tex. App.--Austin
Apr. 3, 2003, no pet.) (mem. op.). The status of C.C.H. was not at issue in the prior appeal. (4) Among
the issues in the prior appeal was Harris's motion for continuance which the trial court had
overruled. This Court noted that the appeal was controlled by then recently enacted procedures
requiring a finding by the trial court regarding the merits of the appeal (5) and that the "case was a little
over a month away from dismissal under an already extended deadline." Id. When Harris sought
a continuance, the Department urged that a continuance raised the risk that the case would not be
heard in time for the statutory deadlines to be met, thereby resulting in its dismissal. In her second
issue, Harris contended that the case of each of the three fathers should be severed and separated into
a different cause and tried separately. This Court rejected the issues and affirmed the termination
of Harris's parental rights to her three older children on the grounds of family code sections
161.001(D) and (E).

 The instant appeal arises from the severed cause involving the termination of Harris's
parental rights as to C.C.H. The Department alleged the following three grounds for termination of
Harris's parental rights as to C.C.H.:


 That Harris knowingly placed or knowingly allowed C.C.H. to remain in conditions or
surroundings which endanger the physical or emotional well-being of the child in violation
of section 161.001(1)(D);


 That Harris engaged in conduct or knowingly placed the child with persons who engaged in
conduct which endangered the physical or emotional well-being of C.C.H. in violation of
section 161.001(1)(E); and


 That Harris had had her parent-child relationship terminated with respect to another child
based on a finding that her conduct was in violation of section 161.001(1)(D) or (E) in
violation of section 161.001(1)(M).


See Tex. Fam. Code Ann. § 161.001(1)(D)-(E), (M) (West Supp. 2006). At the end of a contentious
trial, the court instructed the jury that, for the parent-child relationship to be terminated, one of the
grounds must be proven by clear and convincing evidence and, further, that the jury must find that
the termination is in the best interest of the child. See id. § 161.001. In a second question to the jury,
the charge inquired whether the Department or Harris should be designated the permanent managing
conservator; the jury was instructed that the answer to the question should be based upon a
preponderance of the evidence.

 After the jury returned a verdict finding that Harris's parental rights to C.C.H. should
not be terminated and that Harris should be named managing conservator, the Department filed a
motion for new trial on the ground that the jury's answer to the managing conservator question was
against the great weight and preponderance of the evidence, manifestly unjust, and not in the child's
best interest. The Department sought a new trial in the interest of justice and fairness. On behalf
of the child, the attorney ad litem (6) filed a motion to designate the Department as managing
conservator. Citing the best interest of the child, C.C.H.'s attorney reminded the court that Harris's
parental rights to her three older children had been terminated on endangerment grounds, that
Harris's therapists had testified that she admitted to a history of alcohol and drug abuse, that she had
a history of associating with and having relationships with individuals with criminal records, that
the parental rights of the child's father had been terminated and he had been jailed for violating a
protective order, that both parents had violated the protective order leading to the father's
incarceration, and that the child had lived his entire life in the home of foster parents who had
adopted his three older siblings. C.C.H.'s attorney urged that the Department be named sole
managing conservator for the sake of the child's safety and well-being, and that Harris be named
possessory conservator.

 At a hearing held on April 1, 2005, the court set aside the jury's finding on the issue
of conservatorship and, in accordance with the attorney ad litem's motion, appointed the Department
as the sole managing conservator of the child. The trial court entered a final order confirming the
jury's finding that Harris's parental rights were not terminated and concluding that the jury's finding
that Harris be named sole managing conservator instead of the Department was against the great
weight of the evidence and not in the best interest of the child. Specifically, the court rendered the
following order:

 The Court orders that the finding of the jury that it is not in the best interest of the
subject child that the Department of Protective and Regulatory Services be named
Managing Conservator of said child is against the greater weight and degree of the
credible evidence herein and is not in the best interest of the subject child, and such
finding is set aside.


 On appeal, Harris attacks the trial court's order by first contending that this case was
brought by Harris as petitioner in a suit to modify the parent-child relationship, that the "Department
never made any affirmative pleadings or requests for relief in this action," and "never [re]quested
termination in this case." (7) If, however, this were an appeal from Harris's petition to modify, she
would have had the burden to show that the modification was in the best interest of the child and that
the circumstances of the child, the conservator, or another party affected by the order had materially
and substantially changed since the rendition of the order. See id. § 156.101 (West Supp. 2006). 
Contrary to Harris's assertion, this appeal arises from a suit for termination of parental rights. 
Because Harris never addresses the issues as they relate to the petition to terminate and fails to
include the petition and appropriate citations to authorities and to the record, I would hold first that
she has not preserved error and does not present anything for review. See Tex. R. App. P. 38(h).

 The cynosure of Harris's appeal and the majority opinion is that the trial
court erroneously disregarded the jury's answer to question two by naming the Department as
managing conservator in violation of section 105.002 of the family code. To be sure, section
105.002 requires the trial judge to abide by the jury's determination on the issue of managing
conservatorship. Tex. Fam. Code Ann. § 105.002. The court may not enter a judgment
notwithstanding the verdict. Lenz v. Lenz, 79 S.W.3d 10, 20 (Tex. 2002). But that is not the end of
our review. The jury finding is binding upon the court only when supported by the evidence as in
any other civil action where the parties have a right of trial by a jury. Id.; see also In re Rodriguez,
940 S.W.2d 265, 271 (Tex. App.--San Antonio 1997, writ denied); Fambro v. Fambro, 635 S.W.2d
945, 947 (Tex. App.--Fort Worth 1982, no writ).

 Thus, the appropriate challenge must be directed to a traditional sufficiency review:
Is the evidence legally and factually sufficient to support the jury's finding that appointing Harris as
the child's managing conservator was in his best interest? Lenz, 79 S.W.3d at 26-27. Recognizing
the strong presumption that the best interest of the child is generally served by preserving the parent-child relationship and giving the jury's decision substantial deference in accordance with
our standards of review, I would hold that the evidence is legally insufficient to support the
jury's verdict and, instead, supports the trial court's disregard of the jury's finding regarding
managing conservator.

 In determining the issue of conservatorship, "[t]he best interest of the child
shall always be the primary consideration." Tex. Fam. Code Ann. § 153.002 (West 2002). Although
the majority sets forth the appropriate standard for a legal sufficiency challenge to the question
of conservatorship, it fails to examine the evidence as it relates to the best interest of the child. 
Because the evidence regarding termination also contemplates the best interest of the child, see
Tex. Fam. Code Ann. § 161.001(2), it bears a substantial relationship to the trial court's disregard
of the jury's finding on conservatorship. In re J.F.C., 96 S.W.3d 256, 264-65 (Tex. 2002).

 One of the three grounds alleged by the Department was that Harris's parent-child
relationship was terminated with respect to another child based on a finding that her conduct violated
section 161.001(1)(D) or (E) in that she knowingly placed or allowed the child to remain in
conditions or surroundings which endanger the physical or emotional well-being of the child, or
she engaged in conduct or knowingly placed the child with persons who engaged in conduct which
endangers the physical or emotional well-being of the child. See Tex. Fam. Code Ann.
§ 161.001(1)(M). A court may order termination if the factfinder finds by clear and convincing
evidence that the parent-child relationship was terminated with respect to another child based on a
finding of child endangerment under section 161.001(1)(D) or (E) or a substantially equivalent
provision of another state's law. Id. When a prior decree of termination as to another child is
properly admitted into evidence, the Department is not required to re-establish that the parent's
conduct with respect to that child was in violation of section 161.001(1)(D) or (E). In re J.M.M., 80
S.W.3d 232, 243 (Tex. App.--Fort Worth 2002, pet. denied). The Department need only show that
the parent's rights were terminated as to the other child based on the appropriate findings. Id. at 242-43; see also Tex. Fam. Code Ann. § 161.001(1)(M). Thus, section 161.001(1)(M) is a separate and
independent ground for termination:


 The court may order termination of the parent-child relationship if the court finds by
clear and convincing evidence:


 (1) that the parent has: . . . 


 (M) had his parent-child relationship terminated with respect to another
child based on a finding that the parent's conduct was in violation of
Paragraph (D) or (E) or substantially equivalent provisions of the law
in another state.


Tex. Fam. Code Ann. § 161.001(1)(M).

 The Department introduced into evidence a certified copy of the final order dated
November 14, 2001, terminating Harris's parental rights to other children. Harris did not controvert
this evidence. This evidence thus constitutes undisputed conclusive evidence of a violation of
section 161.001(1)(M). See City of Keller, 168 S.W.3d at 815-16. We may not disregard it. See
Provident Am. Ins. Co. v. Castaneda, 988 S.W.2d 189, 190 (Tex. 1998). We must consider
undisputed evidence that does not support the verdict and set aside the jury's determination if we
find the jury's decision to be unreasonable or we find undisputed evidence that does not support the
jury's decision. See City of Keller, 168 S.W.3d at 821 (if the evidence allows only one inference,
we may not disregard it). Likewise, we may not disregard the legislative choice to provide in the
statutory scheme section 161.001(1)(M) as a ground for termination. (8) The undisputed evidence that
Harris's parental rights to other children had been terminated conclusively establishes a ground for
termination that supports the trial court's disregard of the jury finding. Because this evidence also
constitutes undisputed evidence that Harris's parental relationship endangered the safety of her
children and that termination was in their best interest, see Tex. Fam. Code Ann. § 161.001(2)
(in termination proceeding, court must find termination is in the best interest of the child), it is
conclusive as well on the finding of best interest as it relates to the issue of C.C.H.'s
conservatorship. (9) For this reason, the evidence relating to grounds for termination is relevant to the
issue of conservatorship. But I will nevertheless examine separately the evidence relating to
C.C.H.'s best interest.

 Appellant asserts that the trial court failed to address the issue of the best interest of
the child in its final order. A consideration of the best interest of the child must be viewed in light
of the various factors that cabin the jury's and trial court's determinations. The charge instructed
the jury to consider the Holley factors in determining the best interest of the child. See Holley
v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors include the desires of the child; the
emotional and physical needs of the child, now and in the future; the emotional and physical danger
to the child, now and in the future; the parenting ability of the individuals seeking custody; the
programs available to assist those individuals to promote the best interest of the child; the plans for
the child of those individuals or by the agency seeking custody; the stability of the home or proposed
placement; the acts or omissions of the parent that may indicate that the existing parent-child
relationship is not a proper one; and any excuse for the acts or omissions of the parent. See id. In
1993, the legislature codified those factors identified in Holley and incorporated additional factors
for courts to consider when reviewing the placement of children under the care of the Department. 
See Tex. Fam. Code Ann. § 236.307 (West 2002). Section 263.307 provides the following factors
for determining the best interest of the child:


 (1) the child's age and physical and mental vulnerabilities;


 (2) the frequency and nature of out-of-home placements;


 (3) the magnitude, frequency, and circumstances of the harm to the child;


 (4) whether the child has been the victim of repeated harm after the initial report
and intervention by the department or other agency;


 (5) whether the child is fearful of living in or returning to the child's home;


 (6) the results of psychiatric, psychological, or developmental evaluations of the
child, the child's parents, other family members, or others who have access
to the child's home;


 (7) whether there is a history of abusive or assaultive conduct by the child's
family or others who have access to the child's home;


 (8) whether there is a history of substance abuse by the child's family or others
who have access to the child's home;


 (9) whether the perpetrator of the harm to the child is identified;

 (10) the willingness and ability of the child's family to seek out, accept, and
complete counseling services and to cooperate with and facilitate an
appropriate agency's close supervision;


 (11) the willingness and ability of the child's family to effect positive
environmental and personal changes within a reasonable period of time;


 (12) whether the child's family demonstrates adequate parenting skills, including
providing the child and other children under the family's care with:


 (A) minimally adequate health and nutritional care;


 (B) care, nurturance, and appropriate discipline consistent with the child's
physical and psychological development;


 (C) guidance and supervision consistent with the child's safety;


 (D) a safe physical home environment;


 (E) protection from repeated exposure to violence even though the
violence may not be directed at the child; and


 (F) an understanding of the child's needs and capabilities; and


 (13) whether an adequate social support system consisting of an extended family
and friends is available to the child.



Id.

 Under a legal sufficiency review, we review the evidence in the context of these
factors, considering as we must only the evidence and inferences tending to support the jury's finding
and disregarding all evidence and inferences to the contrary. Noticeably absent from Harris's
proof--and the majority opinion--is any evidence relating to the child's best interest.

 In a glancing reference to the child's best interest, the majority references the
rebuttable presumption that it is in C.C.H.'s best interest to be raised by his natural parent, Harris's
assertion that she had stable employment for over two years, Harris's denial of drug use, and
testimony by witnesses that they had never seen Harris use drugs or act as though she was under the
influence of an illegal drug. Indeed, the testimony regarding what was in C.C.H.'s best interest was
sparse. The record shows that Harris never testified to what would be in the child's best interest;
rather, she testified generally that she did not believe the foster parents, the CASA volunteer, and
the guardian ad litem were acting in the child's best interest.

 But there was ample testimony contrary to the jury's finding to support the trial
court's disregard of that finding. Leslie Ontiveros, a supervisor of investigations for Child Protective
Services for Hays and Caldwell Counties, testified that she first became involved with the family in
October 1999. The Department had received a referral for the sexual abuse of C.D., Harris's seven-year-old daughter, by Harris's then boyfriend, Danny Gonzales. C.D. made an outcry statement to
a teacher. But Harris did not believe her daughter and accused her of "making the story up." During
her testimony, Harris acknowledged that she did not think the accusations were legitimate and that
C.D. was not honest. She thought C.D. was probably mad because Harris had left C.D.'s father and
C.D. was a "daddy's girl." When confronted with the "story," Gonzales did not protest the
allegations and later pleaded guilty to indecency with a child, to wit, C.D. (10) Harris acknowledged
that she took the children, including C.D., to jail to visit Gonzales once or twice. She agreed it was
a poor choice, but she "wanted answers" and thought Gonzales was the one who could provide them. 
Harris thought it would be safe to take the children to the jail because jailhouses are safe and she
couldn't find anyone to keep the children.

 Testifying on her own daughter's behalf, Karen Bryant, Harris's mother, testified
that she and Harris thought C.D. had also been abused by Harris's first husband as well because
C.D. "was exhibiting some behaviors" that appeared to be from abuse. Bryant testified that Harris
had been abused as a child by Bryant's second husband and had been to numerous therapists
and counselors.

 The Department received a second referral for neglectful supervision of the three
children in May 2000. Ontiveros testified that she received information from law enforcement that
Harris frequented a known crack house in San Marcos and that a sex offender also resided at the
residence. Ontiveros tried to visit with the children at school, but one had been suspended and the
other could not be located at school on that day or the next. C.D. confirmed to Ontiveros that Harris
allowed the children to have contact with the known sex offender. At trial, Harris introduced
evidence that the sex offender was not convicted until 2002. Although Ontiveros testified that Harris
was cautioned about him earlier, Harris testified that she should not be charged with knowledge of
his sex-offender status prior to his conviction. Ontiveros testified that when she received
information that Harris was visiting a known crack house and had friends over to her residence to
use crack, she went by Harris's house to check on the children. After speaking with the children,
Ontiveros removed the children when Harris refused a drug test.

 Ontiveros acknowledged that Harris tested positive for marijuana on one occasion,
and that she was uncooperative and refused to be tested on numerous occasions. Harris did not
believe she had a drug or alcohol problem and was resistant to participating in drug and alcohol
screening and treatment. Harris participated in some psychological counseling, parenting classes,
and visits with her children, but she failed to complete her therapy and did not follow through on her
visits with the children. Ontiveros testified that "[s]he was very confrontational in my dealings with
her" and was angry that CPS was involved.

 Harris's third husband, Cleiffort Cooks-Harris, whose parental rights to C.C.H. were
terminated in 2001, testified that Harris obtained a protective order against him in January 2004 and
that he had been arrested on two occasions for violating the order. The order arose out of a dispute
between Cooks-Harris and Harris over his involvement with another woman and Harris taping his
telephone calls with the woman. There was a physical altercation, Cooks-Harris pulled the telephone
out of the wall, and Harris called the police and left to stay in a woman's shelter. A CPS investigator
testified that Cooks-Harris pulled the telephone away from Harris, causing the cord to break and pull
from the wall, and causing an injury to one of the children. Cooks-Harris complained that Harris
pulled his hair out. Harris decided to file for divorce and to obtain a protective order. The order
included the following findings:


 The Court finds that the Respondent has committed family violence against a
member of the household and that family violence is likely to occur in the foreseeable
future.

 

 The Court finds there is a clear and present danger that acts of family violence will
be committed in the future.


 The Court finds that the Applicant and/or other members of the family or household
will suffer immediate and irreparable injury, loss or damage for which there is no
adequate remedy at law.


 The Court finds that the . . . Protective Orders are necessary for the prevention of
family violence and are for the safety and welfare and in the best interest of the
Applicant and for the protection of the minor children and other members of the
family or household.

Cooks-Harris testified that from time to time he would babysit for Harris when she needed a
babysitter. He was arrested twice for violation of the order and was in jail at the time of trial. In
addition, Cooks-Harris had a 1981 conviction for aggravated assault, was unemployed, and had a
prior protective order entered against him in 1992. He testified that he was unaware of the reason
for the protective order, that perhaps his wife would know.

 In her testimony, Harris testified that she called the police because her husband
"challenged" her and obtained the protective order as a consequence of her anger. She had filed for
divorce from Cooks-Harris and acknowledged that she would invite him to babysit despite the
protective order, which she claimed she had tried to lift. Harris explained that "I was more afraid
of the State than I was my own husband" and she was scared CPS "was coming."

 Kelly Ragland, a CPS investigator in the conservatorship unit who replaced another
worker with whom Harris had a difficult relationship, testified about efforts to reunite the family. 
Ragland described her efforts to keep Harris involved with therapy, drug and alcohol treatment, and
visits with her children despite Harris's resistance to therapy, and "oppositional" and confrontational
approach to CPS involvement. Ragland testified about her numerous efforts to have Harris attend
therapy and visit her children:


 I would call the house to let her know things like the children had been moved from
one placement to another or to let her know that we had visits scheduled for her. She
would hang up the phone on me, she would tell me not to call her home anymore. 
Mr. Harris would get on the phone and say that we were never to call their home. I
would send letters to the house to try to explain, you know, what needed to happen
as far as what she needed to do. And she would occasionally call me back and she
would leave me messages yelling on the phone. It was very, very difficult to work
with Mrs. Harris.


Ragland testified that Harris initially refused to visit with the children unless they were all present,
which was difficult because, at the beginning, they were each in different foster homes or treatment
centers. When Ragland could arrange to have all four children present at the same time, Harris
would then visit. On one occasion when Ragland had "finally accomplished visitation," she
observed Harris explain to K.D. that he would have to testify in court. Ragland explained to Harris
why this interaction was harmful to the children and left the room to observe her behavior from
another room. Harris then showed K.D. a wedding photograph of her new husband, Cooks-Harris,
to which K.D. expressed surprise. Ragland explained to Harris that she should discuss these matters
with a caseworker before springing them on the children. When a caseworker questioned her
conduct, Harris told her eldest child, M.H., that her rights were being violated, and Harris left the
visit early. K.D. began crying, and M.H. tried to comfort him.

 Ragland testified that she concluded Harris was not making an effort to visit with her
children. Because setting up meetings by telephone became difficult and Harris would hang up on
caseworkers seeking to set up visits, CPS began sending letters. On one occasion, at Harris's
request, CPS had arranged for Harris to be transported by a CASA volunteer to the treatment center
in another city where her daughter, C.D., was located. When Harris failed to appear for the trip, 
CPS learned that Harris had traveled to the treatment center and had an unsupervised visit with C.D.
the day before.

 On another occasion, Harris arrived with birthday presents for C.D., but left with
the presents at the end of the visit. Harris testified that she did not want the gifts to be stolen while
C.D. was residing at the treatment center. Similarly, at Christmas, Harris presented the children
with gifts only to pack them up at the end of the visit, explaining that they could have them when
they came home.

 On two separate occasions, CPS hired security for visits based on threats from Cooks-Harris. Ragland testified that she was present when Cooks-Harris threatened a worker. Ragland also
testified that Harris failed to submit to drug tests and availed herself of visiting opportunities only
two or three times during the course of six to eight months even though she was allowed visits twice
monthly. On cross-examination, Ragland testified that, although she never saw Harris physically
harm the children, she observed Harris interact with her children in a way "that was harmful to their
emotional well-being." Ragland testified that Harris was one of the most difficult parents to work
with in terms of trying to get her to follow through with recommendations and having appropriate
interactions with her children when she did visit with them. Ragland concluded that C.C.H. should
be removed at birth because the risk to C.C.H. was too great and risk factors in the home had not
been reduced to the point where the child could be safely maintained in the home.

 One of Harris's therapists, Chris Farrell, testified that Harris had "gone through" three
caseworkers and three therapists by the time he became involved. She failed to show up for her first
two appointments, and she did not call. When she appeared for her third appointment, she was
angry. Farrell described Harris as self-absorbed with narcissistic and paranoid personality disorder. 
At one session, after an angry and confrontational exchange, Harris stated, "I'm always angry." 
Harris made threats against CPS and warned that "they better hope they never end up in a nursing
home" where she worked. Harris told Farrell of a woman who called her at the nursing home and
made "threats." Harris threatened "back," reminding her that the woman's mother was in Harris's
care. On one occasion when Farrell advised Harris he would be ten minutes late in ending a session
with another patient, Harris angrily walked out and slammed the door. Farrell discussed Harris's
lack of cooperation with Kelly Ragland. Harris told Farrell that Cooks-Harris had made a decision
to ignore a court order to undergo paternity testing and that she supported his decision. Harris failed
to conclude the assessment portion of her therapy and dropped out short of the nine sessions cited
by the majority. On the date of her last appointment, Harris failed to show up or call, and she never
returned. Farrell terminated her sessions for noncompliance.

 Farrell testified that he was "shocked" at Harris's potential for violence and concerned
about her lack of cooperation with therapy. He concluded she was a very dangerous and violent
woman, had made threats against others, and that he could not ensure the safety of her children. 
Accordingly, Farrell recommended termination of Harris's parental rights due to the violent nature
of her personality: "She talked about breaking people's legs." Farrell testified, "I would say that
with a woman with this level of anger and rage within her anything is possible," and that Harris
would not take responsibility for her actions and was entrenched in her world view. Farrell
explained that Harris's sexual abuse as a child was a significant aspect in her developmental history
and that it was also relevant that her mother had abused drugs, Harris grew up in foster care and had
an extensive amount of therapy and counseling throughout her life, her sisters were also sexually
abused and had abused drugs, and her most recent husband abused drugs. Farrell felt he was making
progress with Harris at the time she discontinued her sessions.

 Gayle Michalek, Harris's licensed professional counselor for the period of August to
December 2000, testified that she had seen a worrisome pattern of behavior by Harris and was
concerned that Harris had not taken responsibility for the problems that had occurred in the case. 
Michalek was very concerned about the children returning home and that Harris had regressed in her
treatment rather than making progress. Michalek was concerned that Harris was not stable, was not
participating adequately in drug and alcohol counseling, and had not complied with Department-requested drug testing. Michalek was also concerned that Harris blamed her eight-year-old daughter
for her "sexualized behavior" and that she was "all over" Gonzales and may have initiated some of
the sexual activity. Michalek agreed, however, that Harris was not physically abusive nor an
uncaring mother.

 Sherryl Boyd, the guardian ad litem and court-appointed special advocate for all of
the children beginning in 2002, testified that she was appointed to make recommendations to the
Court about the welfare of the children and what was in the children's best interest. She described
the change in the children and the progress they made when they were removed to their "permanent"
foster care family. Boyd testified that their environment was now meeting their needs and that their
best interests were being served in their new surroundings. C.C.H.'s siblings had been adopted by
the family with which he lived, he was thriving, and he "could not be in a better place." Their home
was calm, comfortable, and well-kept. Boyd explained that it is not a fancy home but a loving and
wholesome situation. The children are close to each other and love their parents. The children had
described to Boyd the fighting, drinking, and drug use that occurred in the Harris household and that
it had been M.H.'s primary responsibility to take care of K.D.--to change his diapers, feed him, and
clean up. Because Harris often worked at night and slept during the day, there was no one to take
care of K.D. M.H. told Boyd that Harris had a bad temper and often hit him. On cross-examination,
Boyd acknowledged that she had never seen the children interact with Harris.

 C.C.H.'s foster mother and the mother of C.C.H.'s three siblings testified that in
February 2004 C.C.H. turned three years old and in July 2004 had lived with the family for three
years. She described how he loved to talk, was happy and full of life, and particularly close to M.H.,
his oldest brother. He fit seamlessly into the family, and it was in C.C.H.'s interest to stay with his
siblings. The foster mother is a school counselor, and the father is a high school teacher. They had
expressed a desire to adopt C.C.H.

 Harris's employer testified that Harris was a direct caregiver and had provided in-home care to elderly and disabled patients for two-and-one-half years. She described Harris as an
excellent and professional employee. She had only seen C.C.H. two times and was not aware that
Harris's parental rights to her other three children had been terminated. Taylor Skaar, a domestic
violence counselor at a woman's shelter, testified that the only requirement for women to receive
services at the shelter is that they have a history of abuse. She testified that Harris had suffered
domestic violence from her first husband and that "things" were "rocky" with her current husband,
Cooks-Harris. She was not aware of any drug or alcohol use by Harris. A neighbor also testified
that he had never seen any evidence of drug use by Harris and was unaware of the protective order.

 Harris then testified that her children had been in foster care for several years and that
she was not allowed to know where they were because "I guess, my rights aren't as important as
their's." She denied using drugs, taking her children to a crack house, or associating with a known
sex offender. She complained that the "known" sex offender was convicted a year after her rights
to her three older children were terminated. Harris admitted that she had used marijuana when she
learned her daughter had been sexually abused by her boyfriend but that she had gone to the park to
use it and had not used it around her children. She protested that she did not want to take drug tests
because she did not want to pay for them. She acknowledged she had visited Gonzales in jail with
her children once or twice because she wanted answers, he had them, and she could not find anyone
to keep her children. She testified that CPS "endangered" her marriage to her current husband. She
thought she had attended fifty or more Alcoholics Anonymous meetings over the past couple of
years. She intended to divorce Cooks-Harris. She had stayed in San Marcos for the sake of her
children, and she testified that "[t]hey'll be back." There was only a scant reference by Harris to the
best interest of the child.

 On cross-examination Harris testified that she had been removed from her mother's
custody when she was a young teenager for reasons known to her mother. She stayed in a group
home in Montana until she went home. She married Steve Dietrick and, like her mother, suspected
that he molested her daughter, C.D. She did not report her suspicions to the police. She testified that
Gonzales never lived with her but would stay with her several days each week as long as they dated,
which was less than a month. She agreed it was not a wise choice to take the children to visit him
in jail. She acknowledged that she had had a number of therapists, probably "less than ten." She
also acknowledged that she had heard allegations from Ontiveros and others that a person with
whom she was associating was a sex offender, but she was unable to confirm it to her satisfaction. 
Harris was twenty years old when she had her first child with Dietrick. They had two children
together, he had a drug problem and abused her, and he was in prison. He did not provide any
support for her or the children. She acknowledged that she refused to take a urinalysis test without
a court order. She filed a grievance against the children's attorney ad litem for speaking to her out
of the presence of her own attorney.

 Based upon the evidence presented at trial and considering the pertinent factors from
Holley and section 263.307 of the family code, I would conclude that, even when considered in the
light most favorable to Harris, the evidence supports the trial court's presumed finding that
appointment of the Department as managing conservator would be in the best interest of C.C.H. He
had lived his entire life with the foster family who had adopted his siblings. The foster parents had
raised C.C.H., and he was in good health and progressing normally. The record showed continuity
of parental affection and care by the foster parents. There was ample testimony that C.C.H. had
bonded with his foster family, was close and attached to his siblings, and that the family was a strong
family unit. Both the guardian ad litem and the attorney ad litem recommended that Harris's parental
rights to C.C.H. be terminated and that the best interest of the child would be served by allowing him
to remain with the only family he has known. At the time of the trial, both biological parents had
violated a domestic-violence protective order, the biological father whose rights to C.C.H. had been
previously terminated was in jail for violation of the protective order, and there was an indication
that the conduct would continue. Even if the factfinder had believed Harris that she obtained the
protective order out of anger, the record showed that Harris was complicit in ignoring two court
orders--the protective order and the court's order that Cooks-Harris undergo a paternity test. There
was no evidence of any emotional attachment between the child and his remaining parent.

 Case workers testified that the Department's permanence plan for C.C.H. was
termination and placement for adoption because Harris had demonstrated noncompliance with
previous services and C.C.H. had been placed with the foster parents who adopted his brothers and
sister. Harris demonstrated recalcitrance in accepting the Department's services and made desultory
and meager efforts to act in the interest of her children.

 The presumption in favor of a biological parent flows from the belief that the parent
will act in the child's best interest, a presumption that has been rebutted and for which I would
conclude there is no evidence here. Query how it cannot be in a child's best interest to stay with the
only stable, loving family unit--including his brothers and sister--that he has known in his entire
life. It is evident from the record that the length of time C.C.H. has been living with his foster family
is a significant factor. Courts have recognized a child's need for permanence as "the paramount
consideration for the child's present and future physical and emotional needs." In re M.A.N.M.,
75 S.W.3d 73, 77 (Tex. App.--San Antonio 2002, no pet.); see Lehman v. Lycoming County
Children's Servs. Agency, 458 U.S. 502, 513 (1982) (children need stable, long-term relationships
with caretakers). But my view does not rest on lapse of time or assigning blame for the delay in
these proceedings. We may not allow a determination of the best interest of the child to turn on
personal preferences, speculative concepts of proper child rearing, or who "deserves" the child; it
is for this reason that we rely on the determinable legal standard provided by the Holley and statutory
factors, none of which support a finding in favor of the mother based on the record before us.

 Our task is made difficult by the Department's perfunctory performance in adducing
evidence regarding C.C.H.'s best interest. And Harris's attorney advised the jury in his opening
statement that the trial would be contentious and "we're going to have a dog fight." In his closing
statement he reiterated that he "promised you that you'd see a dog fight. You saw a dog fight. It's
ugly. There ain't a pretty thing about a dog fight. . . . Both dogs usually get hurt." It does not
redound to the child's benefit or that of the system for a trial to deteriorate into pitched battle. And
we should not protect parental rights at the expense of the best interest of the child, for the best-interest analysis evaluates that of the child, not that of the parent.

 Even when all of the evidence is viewed in the light most favorable to the verdict
and considered under the pertinent Holley and section 263.307 factors, I would conclude that
the evidence presented at trial would not enable reasonable and fair-minded people to reach
the verdict reached by the jury. I would conclude that the evidence is legally insufficient to support
the jury verdict and sufficient to support the trial court's presumed finding that appointment
of the Department as managing conservator would be in the best interest of C.C.H. See Lenz,
79 S.W.3d at 19.

 Because I would affirm the judgment of the trial court, I respectfully dissent.



 __________________________________________

 Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Filed: June 15, 2007
1. This is an accelerated appeal pursuant to family code section 263.405(a). See Tex. Fam.
Code Ann. § 263.405(a) (West Supp. 2006) (since September 1, 2001, an appeal from a final order
terminating the parent-child relationship and appointing another as managing conservator is
accelerated and governed by the rules for accelerated appeals in civil cases); see also In re J.L.,
163 S.W.3d 79, 81-82 (Tex. 2005). A final order was entered in April 2005, and Harris appealed
to this Court that same month.


 For reasons not explained in the record, Harris's counsel did not include the Department's
original petition in the record before us and seems to be under the mistaken impression that this
appeal arises from Harris's own petition to modify the parent-child relationship with respect to
C.C.H. and not from the Department's petition to terminate parental rights.
2. There is an indication in the record that Harris had some visits with the child at the time
of trial. For reasons not in the record, Harris was generally denied visitation. 
3. Harris v. Texas Dep't of Protective & Regulatory Servs., No. 03-01-00643-CV, 2003
Tex. App. LEXIS 2842 (Tex. App.--Austin Apr. 3, 2003, no pet.) (mem. op.).
4. For reasons not in the record, Harris's parental rights as to C.C.H. were severed and tried
separately and are now the subject of this separate appeal.
5. See Tex. Fam. Code Ann. § 263.405(b), (d) (West Supp. 2006) (enacted by Act of May 22,
2001, 77th Leg., R.S., ch. 1090, § 9, 2001 Tex. Gen. Laws 2397, 2397-98, effective Sept. 1, 2001,
amended by Act of May 12, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332).
6. At a hearing for the purpose of rendering a final order on March 18, 2005, the attorney ad
litem was not present and had notified the court that he was seriously ill and would be unable to
attend. Harris's attorney objected to any further postponement and observed that the attorney had not
filed any post-trial motions. In fact, the attorney ad litem's motion to designate the Department as
managing conservator of the child was filed on the date of the hearing. In any event, on April 1,
2005, a second attorney ad litem was substituted for the original attorney ad litem, who died in
July 2005. The record does not show that the second attorney ad litem ever appeared in a
proceeding.
7. Perhaps this is the reason Harris failed to include the Department's petition for termination
as to the four children--but severed as to C.C.H.--in the record on appeal. See supra note 1.
8. Hence, the majority observes that most of the Department's evidence related to Harris's
behavior with her older children because the Department removed C.C.H. the day after his birth. A
finding of parental conduct endangering a child may also be based on the parent's conduct with
regard to the child's siblings prior to the child's birth. See, e.g., Dallas County Child Protective
Servs. Unit v. Bowling, 833 S.W.2d 730, 733-34 (Tex. App.--Dallas 1992, no writ) (sexual abuse
of oldest son before birth of child in question was evidence of course of conduct that endangered
younger child); Clark v. Clark, 705 S.W.2d 218, 219 (Tex. App.--Dallas 1985, writ dism'd w.o.j.). 
A petition to terminate may be filed before a child is born. Tex. Fam. Code Ann. § 161.102
(West 2002). Conduct that occurred before the child's birth may be considered in determining
whether a parent has endangered a child. In re S.F., 32 S.W.3d 318, 322 (Tex. App.--San Antonio
2000, no pet.); In re M.J.M.L., 31 S.W.3d 347, 351-53 (Tex. App.--San Antonio 2000, pet. denied). 
Moreover, conduct directed at another child may be sufficient to demonstrate a course of conduct
that endangered a child's emotional well-being even if the abusive conduct was not committed in
the child's presence. E.g., In re B.B., 971 S.W.2d 160, 169 (Tex. App.--Beaumont 1998,
pet. denied); Lucas v. Texas Dep't of Protective & Regulatory Servs., 949 S.W.2d 500, 503-04
(Tex. App.--Waco 1997, writ denied) (father endangered all his children when he sexually assaulted
one of them). Even apart from the evidence involving other children, however, the termination of
another child and its proof at this trial is conclusive evidence of a ground for termination under
section 161.001(1)(M).
9. In a suit for termination of parental rights, family code section 161.205 authorizes the court
to either deny the petition or render any order in the best interest of the child. Tex. Fam. Code Ann.
§ 161.205 (West 2002). Moreover, section 263.404 expressly authorizes the trial court to enter an
order appointing the Department as managing conservator without terminating parental rights if the
trial court finds that appointment of a parent as managing conservator would not be in the best
interest of the child's because it would significantly impair the child's physical health or emotional
development. Id. § 263.404(a) (West 2002). In light of the jury's decision not to terminate Harris's
parental rights, the trial court's disregard of the jury's finding on conservatorship and presumed
finding that it was not in the best interest of C.C.H. to appoint Harris as managing conservator
comports with the court's authority under sections 161.205 and 263.404.
10. The plea bargain agreement and judgment and sentence were introduced into evidence.